**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

Northwestern Graduate Workers for Palestine
(GW4P), Ifeayin Eziamaka Ogbuli (individually
and on behalf of others similarly situated), and
Marwa Tahboub (individually and on behalf of
others similarly situated);

        Plaintiffs,

   v.

Northwestern University,               JURY TRIAL DEMANDED

        Defendant.

---

## <u>CLASS ACTION COMPLAINT FOR DECLARATORY, MONETARY AND INJUNCTIVE RELIEF</u>

The plaintiffs ("Plaintiffs"), by and through undersigned counsel, bring claims against the

defendant, Northwestern University ("Defendant," or "Northwestern," or "the University") for

violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), the Civil

Rights Act of 1866 ("Section 1981"), and the Illinois Worker Freedom of Speech Act, 820 ILCS 57,

and in support of those claims, state as follows:

### I.     INTRODUCTION

1. Under the pretense of combating antisemitism, Defendant Northwestern University has

enacted policies and practices that prohibit expressions of Palestinian identity, culture, and advocacy

for self-determination and silence those, including Jewish students, who express solidarity with

Palestinians or even engage in critical academic engagement with Zionism.

2. Those policies and practices are reflected through Northwestern's unequal application of its

student conduct policies, its prohibition of Palestine solidarity speech on campus, and its

1

incorporation of an unscholarly and discriminatory definition of antisemitism into its broader policies on discrimination.

3.  The University imposes ethnic homogeneity and political orthodoxy on students through several means, including by requiring them to 1) complete a training course that includes watching a training video, created in collaboration with an organization devoted to silencing criticism of Israel, which equates critical engagement with Zionism with anti-Jewish statements by the Ku Klux Klan ("the JUF video"), and 2) agree to be subject to disciplinary policies that incorporate the speech rules of the JUF video and otherwise characterize antizionism and certain types of criticism of the state of Israel as "antisemitic" ("the Attestations").

4.  Northwestern coerced many of its students into completing the Attestations and watching the JUF video by placing a hold on the registration of students who did not. On information and belief, approximately three dozen students have continued to refuse to do so for moral, political, and/or identity-based grounds. Many of them explained the bases of their refusal directly to Northwestern's administration.

5.  Northwestern's Faculty Assembly overwhelmingly voted against the imposition of the JUF video on students and the imposition of discrimination policies that "limit speech, scholarship or criticism of any nation or government."

6.  Northwestern refused to modify the Attestation and JUF video requirements and will terminate the student affiliation of students who do not complete them by October 20, 2025 or by February 2, 2026, depending on whether they preregistered for the Fall quarter prior to being placed on a registration hold.

7.  Northwestern has not issued any comparable threats nor registration holds to students who refrained from completing its mandatory sexual misconduct training.

8.  Arabs are a distinct national origin group protected under both 42 U.S.C. § 1981 and Title

VI of the Civil Rights Act of 1964. Palestinians are part of the Arab national origin group. Antizionist Jews are also a cognizable ethnic group under both statutes.

9. These policies and practices discriminate against the University's Palestinian and other Arab students by branding their ethnic and religious identities, cultures, and advocacy for the rights of their national group as antisemitic and subject to discipline. The University does not police the identities of other ethnic or racial groups in this manner.

10. The Illinois Worker Freedom of Speech Act prohibits employers from using penalties or threats to induce employees into attending meetings or listening to communications about the employer's religious or political opinions. Northwestern's threat to terminate the student status of its student workers who decline to complete the Attestations and watch the JUF video violates that law.

## II.    JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiffs assert claims arising under the laws of the United States, namely 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  Plaintiffs' state-law claims form part of the same case and controversy and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

12. Venue is proper in the United States District Court of the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) as the Northern District is "a judicial district in which any defendant resides" and "all defendants are residents of the State in which the district is located." Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), as the Northern District is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"

### III.    PARTIES

13.  Plaintiff Northwestern Graduate Workers for Palestine ("Grad Workers for Palestine") is a collective of graduate students at Northwestern committed to standing up for the Palestinian people through the frameworks of collective liberation, anti-colonialism, and global initiatives, primarily in the academic and institutional realms. Grad Workers for Palestine has associational standing to seek declaratory and injunctive relief on behalf of its members because its student members have standing to sue in their own right, the interests it seeks to protect by this lawsuit (protecting the right to advocacy about justice in Palestine) are germane to its purpose, and none of the claims it asserts nor the relief it requests requires the participation of its individual members. Grad Workers for Palestine also has standing to sue in its own right because the policies challenged herein have required it to divert resources away from its regular activities and focus instead on securing the right to engage in those activities in the first place.

14.  Plaintiff Ifeayin Eziamaka Ogbuli is a second-year doctoral student at Northwestern in the History department. She is a Teaching Assistant for the University and an employee within the meaning of the Illinois Worker Freedom of Speech Act, 820 Illinois Compiled Statutes ("ILCS") 57/10, because Northwestern permits her to work in the occupation of teaching assistant under the University's control and direction within its usual course of business and place of business. Plaintiff Ogbuli is not Arab, Jewish, or Muslim, but publicly associates with these students, and wants to engage in and listen to discussions and advocacy related to the rights of Palestinians but is limited in her ability to do so because of the violations and unlawful policies described herein.

15.  Plaintiff Marwa Tahboub is a fifth-year doctoral candidate at Northwestern in the Media, Technology & Society program. She received a Master's degree from Northwestern in 2023. Ms. Tahboub is an American of Syrian and Palestinian national origin. She is an employee of the University within the meaning of the Illinois Worker Freedom of Speech Act, 820 Illinois Compiled

4

Statutes ("ILCS") 57/10, because Northwestern permits her to work in the occupation of teaching assistant under the University's control and direction within its usual course of business and place of business. Plaintiff Tahboub wants to engage in and listen to discussions and advocacy related to the rights of Palestinians but is limited in her ability to do so because of the violations and unlawful policies described herein.

16. Defendant Northwestern University is a not-for-profit university whose main campus is located in Evanston, Illinois. Northwestern receives financial assistance from the United States Government.

## IV.    FACTUAL ALLEGATIONS

### A.  Northwestern deploys campus police to attack students participating in a nonviolent encampment engaged in speech in solidarity with Palestinians

17. Between April 25, 2024, and May 1, 2024, Northwestern students built an encampment at Deering Meadow on Northwestern's Evanston campus in solidarity with Palestinians under siege and in protest of the University's entanglement with Israeli institutions they believe to be oppressive toward Palestinians. They constructed the encampment more than six months into Israel's campaign of bombing, mass killing, and humanitarian blockade in Gaza, after the International Court of Justice ruled the Republic of South Africa had made a plausible case that the campaign was a genocide.

18. The encampment was attended by many members of the student body, faculty, and staff, including members of Grad Workers for Palestine.

19. Deering Meadow has long been a space on Northwestern's campus where students and community members have engaged in political speech, including famously in 1969-70 when it was a site for protests against the Vietnam war and the government's violent repression of student protest.

20. The 2024 encampment carried forth this tradition of nonviolent protest, display of signs,

speeches, dancing, prayer and other overtly Jewish religious activities, and community building.

21. In response, counter-protesters, including Zionist students and community activists, targeted Arab students, the encampment, and other students expressing solidarity with Palestinians for harassment and intimidation.

22. In expressing their displeasure with the encampment and its message, the counter-protestors stole and destroyed property, spat on students, screamed in their faces, and called the Jewish participants "fake Jews." One counter-protestor threatened a student of Arab origin, stating "You are lucky you are here; if you were in Israel I'd just shoot you like an animal."

23. Although this harassment was well known on campus and much of it was reported to the administration, on information and belief, the University did not conduct any meaningful investigation or discipline any of the students involved in the harassment of students participating in the encampment.

24. Instead of protecting Plaintiffs and others participating in the encampment, the University deployed the Northwestern University Police Department ("NUPD") into the encampment to crack down on the protesters. Northwestern faculty and staff members intervened to protect the student protesters from the police by creating a line and linking arms. The NUPD responded to the faculty and staff with excessive and unreasonable force and by filing criminal complaints against four of them (all of whom had spoken at the encampment in solidarity with Palestinians). The Cook County State's Attorney declined to prosecute.

**B. Northwestern yields to unconstitutional governmental pressure on Northwestern to repress student speech**

25. On or about May 10, 2024, the Committee on Education and the Workforce of the United States House of Representatives ("the Committee"), which oversees higher education, opened an investigation into Northwestern following what Representative Virginia Foxx described as

Northwestern's "decision to capitulate to antisemitic, pro-terror encampment organizers" and demanding the expulsion and discipline of students and faculty. The Committee's investigation exceeds its constitutional authority.

26. On May 23, 2024, Northwestern President Michael Schill testified before the Committee and accepted his interrogators' framing of the encampment as "antisemitic" and "pro-terror." He did refuse to discuss the specifics of individual student and faculty cases.

27. Displeased with President Schill's less-than-complete capitulation to its inappropriate questions and demands, the Committee sent him a letter on June 7, 2024 demanding disciplinary information about students and faculty who participated in the encampment and complained that Northwestern had "failed to impose a single suspension or expulsion for student antisemitic conduct since October 7."

28. The June 7 letter also faulted President Schill for saying that he would "not be commenting [on] . . . what students say," characterizing this refusal as an instance of "flagrant disrespect not only toward the Committee, but also Northwestern's Jewish community."

**C. Northwestern enacts new University policies to restrict students from expressions of national origin**

29. Despite its full awareness that the Committee's demands are discriminatory, exceed its constitutional authority, and are pretext for silencing campus protest in solidarity with Gaza, Northwestern capitulated to pressure from the Committee by ramping up its repression of legitimate, non-discriminatory speech by students, faculty and staff in solidarity with Palestinians.

30. President Schill admitted in his August 6, 2025 testimony before the Committee that Northwestern's antisemitism policies are broader than what Title VI requires.[1]

---

[1] Hearing Transcript, Comm. on Educ. & the Workforce, U.S. House of Representatives, at 35 (Aug. 5, 2025), https://edworkforce.house.gov/uploadedfiles/edworkforce_final_transcript_aug_5_2025_redacted.pdf (Interview of

31. Northwestern made several changes to its policies, revoking the section of its student handbook stating that "Northwestern welcomes the expression of ideas, including viewpoints that may be considered unorthodox or unpopular" and instituting new restrictions on campus protest. These new restrictions ("the Censorship Policies") include a ban on overnight demonstrations on campus property - a direct response to the encampment. Northwestern also implemented an Intimidation Policy that could be interpreted to include legitimate speech. Tabling on university property now requires a reservation, advance notice, and a permit from the University's administration. There is also a new restriction on "amplified sound" requiring students to get a permit to use devices that amplify sound. This means legitimate speech that Northwestern's administration simply does not agree with can be denied a permit. The Censorship Policies also limit where flyers can be posted outdoors on campus, now only allowing them on university bulletin boards, where previously they were allowed to be posted on objects such as lampposts and trees. On information and belief, these restrictions were aimed directly and exclusively at suppressing the Palestine solidarity movement on campus.

32. Former President Michael Schill admitted in testimony before the Committee that several of the Censorship Policies were motivated by the encampment and speech in solidarity with Palestine.

## C.  Northwestern targets Arab students and their supporters for disparate discipline.

33. Following the enactment of the Censorship Policies, Northwestern surveilled campus speech, imposed discipline on students and faculty who spoke in solidarity with Palestinians, and selectively enforced its Censorship Policies in order to limit expressions of solidarity with Palestinian victims of genocide.

34. On October 7, 2024, Northwestern students held a vigil on campus to express solidarity with

---

Michael Harry Schill) ("our code of conduct was insufficient to capture antisemitic harassment, because Title VI is a very tough standard, and so we needed something that would be more encompassing").

the tens of thousands of Palestinians Israel had killed in the preceding year. Approximately 100 people attended.

35. Counterprotestors interrupted the event, waving Israeli flags, yelling at people, and using hateful language. Graduate student Eden Melles, a member of Grad Workers for Palestine, reported to Mona Dugo, the Dean of Students, that one of the protestors was invading her personal space and antagonizing her. Dean Dugo dismissed her report and responded, in reference to the vigil, that "This entire thing is antagonizing."

36. The University disciplined Arab students and other students who attended the vigil in solidarity with Palestinians and with their Arab classmates. On information and belief, none of the counterprotestors who disrupted the vigil that day were subjected to disciplinary investigations, even though their behavior violated Northwestern's Demonstration Policy.

37. On other occasions, the University has disproportionately targeted students of Arab origin for discipline, as well as students who publicly associate with Arabs, associate with antizionist Jews, and advocate for Palestinian rights.

38. Northwestern conducts close surveillance of Palestine solidarity protests and gatherings attended by students of Arab origin and those who publicly associate with and support them, uses video footage to identify attendees, and arranges for a heavy police presence at such protests and gatherings. The University does not conduct similar close surveillance and policing of protests that are not associated with solidarity with Palestinians.

39. The University also selectively enforces its Censorship Policies to target speech associated with Palestinians. In June 2024, for example, the University immediately removed flyers announcing a Palestine solidarity protest sponsored by Students for Justice in Palestine at Northwestern. The University then took additional punitive measures that are not contemplated by its Display Policy at all by sending a representative of Students for Justice in Palestine at Northwestern an email stating

9

that that because "flyers were inappropriately placed throughout the Evanston campus," a planned teach-in was "deemed unauthorized" and students who proceeded with the teach-in would face "University discipline and/or arrest." The University's Display Policy contemplates discipline for violations of the policy but does not provide for the summary cancellation of events and arrest of students. Meanwhile, the University routinely takes no action in response to violations of its Display Policy by students posting material bearing no obvious connection to events relating to solidarity with Palestinians.

### D. Northwestern Adopts a Discriminatory Definition of Antisemitism

40. Section I.F.b of Northwestern University's Policy on Discrimination, Harassment, and Sexual Misconduct ("Discrimination Policy") prohibits "Verbal abuse or use of . . . anti-Semitic . . . slurs or hostile behavior." Section I.H identifies possible sanctions for violating the policy, which range from verbal and written warnings to expulsion and degree revocation for students and termination for employees.

41. Around February 2025, Northwestern University formally adopted the International Holocaust Remembrance Alliance ("IHRA")'s definition of antisemitism.[2] The IHRA definition characterizes as antisemitic broad categories of non-discriminatory political speech regarding the Israeli state and its policies, even when made by Jews. For example, it identifies "[c]ontemporary examples of antisemitism" that include "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor"; "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis;" and "[a]pplying double standards

---

[2] Northwestern Univ., Office of the Provost, *Federal Updates: Antisemitism* (n.d.), https://www.northwestern.edu/provost/federal-updates/antisemitism.html ("Northwestern uses the definition of antisemitism endorsed by the International Holocaust Remembrance Alliance.") (last visited Oct. 15, 2025).

by requiring of it a behavior not expected or demanded of any other democratic nation."[3] ("IHRA definition").

42. Kenneth Stern, one of the drafters of the IHRA definition, criticized its misuse, writing, "Unfortunately, . . . the working definition has been primarily used (and I argue, grossly abused) to suppress and chill pro-Palestinian speech."

43. The IHRA definition effectively limits Arab students, and particularly Palestinian students, in their expressions of nationalist aspirations and protest against mistreatment of their ethnic group. While other groups can draw comparisons between their circumstances and past injustices, and advocate for national liberation and equality, Palestinian and other Arab students at Northwestern may not. While other groups are permitted to expose and discuss racism when they perceive it, Palestinians may not.

44. Since February 2025, Northwestern University has required all students, including student workers, to complete a mandatory training, ironically-named "Building a Community of Respect and Breaking Down Bias" ("the training course").

45. As part of the training course, students are required to attest that they have reviewed and agree to be bound by 1) the Discrimination Policy and 2) the Code of Student Conduct. Plaintiffs refer to this requirement as "the Attestations." The Code of Student Conduct and Discrimination Policy incorporate the IHRA definition.

46. The training course also includes a module created in collaboration with the Jewish United Fund ("JUF") entitled "Antisemitism: Here/Now" ("the JUF video"). JUF is an organization that expressly equates antizionism with antisemitism in order to discredit criticism of Israeli government

---

[3] *International Holocaust Remembrance Alliance, Working Definition of Antisemitism* (2016), https://holocaustremembrance.com/resources/working-definition-antisemitism (last visited Oct. 15, 2025)

practices and discriminatory state structures.[4]

47. The JUF video repeatedly conflates Zionism and Judaism in order to render Zionism impervious to critique. For example, the JUF video states that Zionism "is a core part of most people's Judaism" and that "the vast majority of Jewish people" identify as Zionists, adding that "[t]erms like Zionists . . . are euphemisms for Jews."

48. Plaintiffs agree that some Jews incorporate Zionism into their religious and cultural beliefs. Normally, however, Northwestern does not insulate political ideologies that rely on religious justifications from criticism. For example, Northwestern students are free to advocate against the suppression of women's rights in Iran, even though the Iranian government's justification for such suppression has a claimed religious and cultural basis.[5]

49. When it comes to Zionism, however, Northwestern equates criticism of political practices and ideologies with discrimination against Jews themselves.

50. For example, the JUF video portion of the training course explicitly analogizes political commentary that has nothing to do with mistreatment of Jews to bigoted statements by white supremacists. It equates the following two statements:

- Statement by "by anti-Israel activists": "I condemn the conflation of Zionism, a political identity and Judaism, a religious identity. The statement of Israel has attempted to conflate both in order to garner support for its apartheid policies."

- Statement by David Duke: "What is it about Jewish group behavior that creates problems?"

51. According to the JUF video, "For most Jewish people, they feel the same because they are

---

[4]  *Jewish United Fund, Resources to Fight Antisemitism* (n.d.), https://www.juf.org/stopantisemitism/ ("[T]he connection between antisemitism and anti-Zionism."); see also *Rabbi Sacks on the Connection Between Antisemitism, Anti-Zionism, Judaism & Israel* (YouTube, Dec. 2019), https://www.youtube.com/watch?v=MIoZvHU3wwg (last visited Oct. 15, 2025).
[5] Olivia Alexander, *Buffett Institute Holds Bilingual Dialogue Event to Discuss Women's Rights in Iran, The Daily Northwestern* (Oct. 24, 2024), https://dailynorthwestern.com/2024/10/24/campus/buffett-institute-holds-bilingual-dialogue-event-to-discuss-womens-rights-in-iran/ (last visited Oct. 15, 2025).

the same." Northwestern does not apply this wholly subjective standard to other groups.

52. Northwestern's claim that the JUF video and Attestations are not discriminatory but simply seek to prevent anti-Jewish discrimination is pretextual. The JUF video in fact includes claims designed to establish a political orthodoxy on campus about the state of Israel, one which erases Palestinians. Crucially, the video fails to define "the Jewish right of self-determination" but claims it is antisemitic to deny Jews that right. The IHRA definition, the JUF, and the JUF video conceptualize the "Jewish right of self-determination" as permitting all Jews everywhere to reside in and exercise political agency in Israel/Palestine, applying a standard that is far from being a generally accepted principle of legal and political theory.

53. Plaintiffs have a right to point out that the JUF's conceptualization of the "Jewish right of self-determination" is discriminatory, that Jews should be subject to the same standards for determining the contours of their right of self-determination in any given geographical area as any other group. Advocating for universally-applicable legal and political rights on behalf of an ethnic group is not antisemitic, but it does violate Northwestern's JUF video (and Northwestern's discrimination policy/IHRA definition), which claims that "antizionism is the opposition to the Jewish right of self-determination" and "takes many forms, most of which are antisemitic" because "it is antisemitic to deny Jewish . . . self-determination[.]"

54. The rejection of some of the JUF video's claims constitutes an expression of national origin or an affirmation of the right of the Palestinian people to political agency. Northwestern prohibits those expressions, dehumanizing Arabs in the process.

55. Zionists have in fact exercised that claimed "right of self-determination" to establish a system of exclusion and discrimination against the non-Jewish population, proclaiming in Israel's Basic Law that "[t]he realization of the right to national self-determination in the State of Israel is

exclusive to the Jewish People."[6]

56.  In service of that principle, the State of Israel has barred millions of Palestinian refugees from returning to their villages and homes; expropriated property for exclusive Jewish use; imposed a system of military occupation and blockade in the West Bank and Gaza; suppressed Arab nationalism and dissent; imprisoned thousands without charge or trial, including children; killed well over 100,000 Palestinians in the last two years alone; and demolished nearly all of Gaza.

57.  Plaintiff Marwa Tahboub has watched this erasure of her people but is prohibited from questioning the political ideology which fuels it on campus without subjecting herself to discipline. Through the training course, Northwestern is requiring Tahboub to affirmatively agree that critique of a political ideology which erases her national group is antisemitic.

58.  Plaintiffs have a right to oppose the erasure of the Palestinian people. But by requiring students to accept the JUF's version and/or the IHRA definition of "the Jewish right of self-determination," Northwestern is requiring students to either embrace Zionism, which precludes the ability of Palestinians to exercise their own national rights, or be branded as antisemitic and disciplined accordingly.

59.  The JUF video also leaves the door open for claims that any political claims or analysis the JUF disagrees with are antisemitic. It explains, "Israel criticism is fine, if as long as it's not based on . . . distortions of history . . . ." The JUF video seeks to impose the JUF's (contested) historical claims on Northwestern students in furtherance of its discriminatory political goals in Israel.

60.  The Attestations and mandate to watch the JUF video have caused Arab individuals and those who support them injury in the form of emotional distress, and has dissuaded them from

---

[6] *Basic Law: Israel—The Nation State of the Jewish People*, 5778–2018, Knesset, https://main.knesset.gov.il/EN/activity/documents/BasicLawsPDF/BasicLawNationState.pdf. (unofficial English translation).

speaking out against discrimination on campus.

61. The Attestations and incorporation of the JUF video into Northwestern's antisemitism training have also discriminated against and harmed Jewish students who oppose or criticize Zionism and/or other practices of the state of Israel and fail to conform to the JUF's proclamations about what "most people" who are Jewish believe.

62. The Attestations' incorporation of the IHRA definition and the JUF video are not intended to foster a civil and collaborative workplace nor reduce or prevent workplace harassment or discrimination.

63. Northwestern University sent emails to students threatening them with severe consequences if they did not complete the mandatory training and attestation. Specifically, Northwestern University threatened to place such students, including student workers, on a registration hold, preventing them from registering, adding or dropping classes, or attending classes for which they are not registered. Northwestern University told the students that if they remain unregistered, they will not be permitted to live in campus housing, access campus facilities, or receive financial aid, including Federal Work study allocations, and may face impacts to their J-1 or F-1 visas. On information and belief, at least hundreds of students completed the training solely because of these threats even though they objected to participating for the reasons identified herein.

64. Northwestern did in fact place registration holds on students who declined to complete the mandatory training and Attestations even in the face of these threats, including Plaintiff Ogbuli, Plaintiff Tahboub, and several members of Grad Workers for Palestine.

65. Northwestern University also sent the following threat to students who had not completed the registration by September 22, 2025: "If you remain unregistered by Oct. 20 in the Fall or Feb. 2 in the Winter, your academic program will be discontinued, terminating your student affiliation with Northwestern until you complete the attestations and your application to return is approved."

66. Student employees who hold jobs that require student status, including teaching and research assistantships and similar roles, will be ineligible to be hired or for their appointment to continue beyond the present quarter if they do not listen to the University's religious and political opinions conveyed in this discriminatory training course and agree to abide by the University's discriminatory policies.

67. Several members of Grad Workers for Palestine will lose their student status and employment if they do not complete the training course by October 20, 2025. Plaintiffs Ogbuli and Plaintiff Tahboub will lose their student status if they do not complete the training course by February 2, 2026.

68. In contrast, Northwestern imposed no registration hold or other punishment on students who refrained from completing Northwestern's sexual misconduct training in at least the last two academic years.

69. Students and faculty repeatedly protested the training course and made clear to members of Northwestern's administration that the JUF video is discriminatory and not scholarly. The students sent a letter signed by "a group of students and graduate workers who stand united against racist, anti-semitic, anti-Arab, anti-Muslim, and Anti-Palestinian discrimination, we cannot abide by these trainings which reinforce, rather than reduce, the proliferation of discriminatory bias in our communities." Members of Grad Workers for Palestine signed the letter. Provost Hagerty insisted that the training is mandatory.

70. In April of 2025, Northwestern's Faculty Assembly, by a vote of 338 to 83, voted to approve a resolution which included the following statements: "Northwestern shall not limit speech, scholarship or criticism of any nation or government. . . . Northwestern shall not require anyone to view the video on antisemitism and Islam, 'Building a Community of Respect and Breaking Down Bias.'" The faculty was never informed about whether or not the Board of Trustees voted to

approve the resolution.

71. On August 1, 2025, 21 faculty members wrote to President Schill, Provost Hagerty, and Associate Provost Dhar, stating that the JUF video is "unacceptable as a required educational experience for students" and requested that the administration "immediately enter into conversations with affected students, pause the registration holds, and allow for a collaborative process to develop an in-house training module." The administration did not respond to that letter.

## VI.    CLASS ACTION ALLEGATIONS

***Class 1: Discrimination Class – Palestinian students and their associates who were required to undergo Northwestern's discriminatory antisemitism training and sign attestations agreeing to incorporation of the IHRA definition into the Code of Conduct.***

72. Plaintiffs Grad Workers for Palestine, Ogbuli, and Tahboub and bring this action pursuant to Rule 23 of the Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals defined as Palestinian students, supporters and associates who were required to review Northwestern's JUF Video, undergo its "antisemitism" training, and sign attestations as conditions of student status.

73. **Numerosity:** The exact number of Class members is unknown and is not available to Plaintiffs at this time. Defendant imposed the JUF video and the IHRA definition of antisemitism on its entire student body, which is comprised of more than 20,000 students, and on information and belief, there are hundreds of members of the above-defined class. Class members can be identified through Defendant's records, including *inter alia* student records and records of the students who explicitly objected to the training or delayed taking the training until the registration deadline. Other factors, including the possibility of retaliation by Northwestern, U.S. Immigration and Customs Enforcement ("ICE") and the U.S. House of Representatives' Committee on Education and the

Workforce, and Zionist organizations like the Canary Mission (an organization which blacklists student activists), further render joinder impracticable.

74. **Commonality and Predominance:** There are numerous questions of law and fact common to the claims of Plaintiffs and the Class members, and those questions predominate over any questions that may affect individual Class members. Common questions include, but are not limited to, the following:

    a.   Whether the IHRA definition is discriminatory;

    b.   Whether the antisemitism training is discriminatory;

    c.   Whether Defendant acted with discriminatory intent in imposing these conditions and requirements; and

    d.   Whether the antisemitism training is intended to impose political and religious opinions of Northwestern's on students.

75. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

76. Appropriateness: Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual members of the Class to obtain effective relief because the damages suffered by the individual Class members are likely outweighed by the burden and cost of individually conducting the complex litigation necessitated by Defendant's actions. Even if Class members were willing or able to pursue such individual litigation a class action would still be preferable due to the fact that a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint and risk inconsistent results. A class action provides the benefits of fewer management difficulties,

single adjudication, economy of scale, and comprehensive supervision by a single Court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately, the uniformity of decisions.

### *Class 2: Retaliation Class - Students who refused to sign attestations and who suffered a hold on their registrations.*

77. Plaintiffs Grad Workers for Palestine, Ogbuli, and Tahboub bring this action pursuant to Rule 23 of the Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals defined as students who refused to sign attestations and who suffered a hold on their registrations and will consequently suffer the revocation of their student status on October 20, 2025 or on February 2, 2026, depending on whether they preregistered for the Fall quarter prior to being placed on a registration hold.

78. **Numerosity:** The exact number of Class members is unknown and is not available to Plaintiffs at this time. Defendant implemented the Censorship Policies against the entire student body, which is comprised of more than 20,000 students, and on information and belief, many have refused to sign attestations. Class members can be identified through Defendant's records and correspondence with Student Affairs, Northwestern's Office of Civil Rights, and the Office of Community Standards. Other factors, including the possibility of retaliation by Northwestern, U.S. Immigration and Customs Enforcement ("ICE") and the U.S. House of Representatives' Committee on Education and the Workforce, and Zionist organizations like the Canary Mission (an organization which blacklists student activists), further render joinder impracticable.

79. **Commonality and Predominance:** There are several questions of law and fact common to the claims of Plaintiffs and the Class members, and those questions predominate over any questions that may affect individual Class members. Common questions include, but are not limited to, the following:

a. Whether the Censorship Policies were implemented to restrict student speech in solidarity with Palestinians and/or critical of Israel;

b. Whether their refusal to sign attestations is protected opposition conduct;

c. Whether the resultant hold on registrations is a retaliatory adverse action;

d. Whether University policies on student speech, demonstration, display, and "intimidation" were implemented and deployed to restrict student speech in solidarity with Palestinians and/or critical of Israel; and

e. Whether the University failed to protect Palestinian and Arab students (and students who associated with them) against harassment and discrimination because of their expressions of nationalist identity and solidarity.

80. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

81. Appropriateness: Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual members of the Class to obtain effective relief because the damages suffered by the individual Class members are likely outweighed by the burden and cost of individually conducting the complex litigation necessitated by Defendant's actions. Even if Class members were willing or able to pursue such individual litigation a class action would still be preferable due to the fact that a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint and risk inconsistent results. A class action provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single Court, and would

result in reduced time, effort, and expense for all parties and the Court, and ultimately, the uniformity of decisions.

### Class 3: Illinois Worker Freedom of Speech Act Class - Student workers subjected to the mandatory training program.

82. Plaintiffs Grad Workers for Palestine, Ogbuli and Tahboub bring this action pursuant to Rule 23 of the Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals defined as student workers who were required to complete the training course.

83. **Numerosity:** The exact number of Class members is unknown and is not available to Plaintiffs at this time. Defendant implemented the Censorship Policies against the entire student body, which is comprised of more than 20,000 students. Class members can be identified through Defendant's records and correspondence with Student Affairs, Defendant's student employment records, Northwestern's Office of Civil Rights, and the Office of Community Standards. Other factors, including the possibility of retaliation by Northwestern, U.S. Immigration and Customs Enforcement ("ICE") and the U.S. House of Representatives' Committee on Education and the Workforce, and Zionist organizations like the Canary Mission (an organization which blacklists student activists), further render joinder impracticable.

84. **Commonality and Predominance:** There are several questions of law and fact common to the claims of Plaintiffs and the Class members, and those questions predominate over any questions that may affect individual Class members. Common questions include, but are not limited to, the following:

> a. Whether the training program, including the JUF video, reflected Defendant's religious or political opinions;
>
> b. Whether Defendant's requirement to complete the training program and Attestations or else face loss of student status and employment were to induce Plaintiffs and the Class to listen to Defendant's religious and/or political opinions;

c.  Whether the training program's legitimate purpose was to foster a civil and collaborative workplace or reduce or prevent workplace harassment or discrimination.

85. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

86. Appropriateness: Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual members of the Class to obtain effective relief because the damages suffered by the individual Class members are likely outweighed by the burden and cost of individually conducting the complex litigation necessitated by Defendant's actions. Even if Class members were willing or able to pursue such individual litigation a class action would still be preferable due to the fact that a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint and risk inconsistent results. A class action provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single Court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately, the uniformity of decisions.

## Count I
## Discrimination on the Basis of Race
## 42 U.S.C. § 1981
## (All Plaintiffs)

52. Plaintiffs allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

53. Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

54. Plaintiffs are members of racial and/or ethnic minorities protected by 42 U.S.C. § 1981, and/or persons who associate with racial and/or ethnic minorities protected by 42 U.S.C. ¶ 1981, and/or representatives of members of racial and/or ethnic minorities protected by 42 U.S.C. 42 U.S.C. § 1981.

55. Plaintiffs, as students and in some cases as employees, have contractual relationships with Northwestern University.

56. Defendant intentionally discriminates against Plaintiffs due to their race and/or ethnicity and/or because they associate with Jewish and Arab students who oppose or criticize Zionism.

57. The training course is replete with political commentary which restricts Northwestern students from advocating for Palestinian liberation, equal rights, an end to apartheid in Palestine, and for the rights of Palestine's indigenous people (Jewish and non-Jewish).

58. Defendant's discrimination is the but-for cause preventing Plaintiffs from enjoying all benefits, privileges, terms, and conditions of the contractual relationship.

59. Defendant's discrimination has adversely impacted Plaintiffs' rights and educational opportunities.

60. Defendant's conduct caused Plaintiffs severe emotional distress, suffering, anguish, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

**Count II**
**Discrimination on the Basis of Race, Color, and National Origin**
**42 U.S. Code § 2000d, Title VI of the Civil Rights Act of 1964 ("Title VI")**
**(All Plaintiffs)**

61. Plaintiffs allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

62. Defendant Northwestern University is a recipient of federal funds.

63. Defendant Northwestern University intentionally discriminates against Plaintiffs on the basis of their race and/or national origin, and/or because they publicly associate with students who are antizionist Jewish and/or of Arab origin.

64. Plaintiffs have met Northwestern University's legitimate expectations.

65. Plaintiffs were denied equal benefits in their educational program.

66. Plaintiffs and/or Plaintiff's members have suffered, and continue to suffer, adverse actions.

67. Defendant has treated Plaintiffs and/or Plaintiffs' members less favorably than similarly situated individuals who are not Jewish, Arab, and/or Palestinian.

68. Defendant's conduct caused Plaintiffs and/or Plaintiffs' members severe emotional distress, suffering, anguish, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

**Count III**
**Retaliation for Opposing Discrimination (All Plaintiffs)**
**42 U.S.C. § 1981**

69. Plaintiffs allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

70. The Training, JUF Video, and attestations Northwestern require are meant to, and do in fact, dissuade students from advocating for the rights of Arab, Palestinian, and/or Jewish individuals.

24

71. Opposing the discriminatory requirements imposed by Northwestern has caused Plaintiffs and/or Plaintiffs' members to suffer, and continue to suffer, adverse actions, including but not limited to loss of their student status.

72. Defendant's conduct caused Plaintiffs and/or Plaintiffs' members severe emotional distress, suffering, anguish, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

**Count IV**
**Retaliation for Opposing Discrimination (All Plaintiffs)**
**Title VI**

73. Plaintiffs allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

74. The Training, JUF Video, and attestations Northwestern require are meant to, and do in fact, dissuade students from advocating for the rights of Arabs and Palestinians.

75. Opposing the discriminatory requirements imposed by Northwestern has caused Plaintiffs and/or Plaintiffs' members to suffer, and continue to suffer, adverse actions, including but not limited to loss of their student status.

76. Defendant's conduct caused Plaintiffs and/or Plaintiffs' members severe emotional distress, suffering, anguish, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

**Count V**
**Violation of Illinois Worker Freedom of Speech Act, 820 ILCS 57 (All Plaintiffs)**

77. Plaintiffs allege and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

78. Plaintiffs Ogbuli and Tahboub are or have been employees of Northwestern University within the meaning of 820 ILCS 57 and 820 ILCS 115/2 within the past year.

79. Members of Grad Workers for Palestine are or have been employees of Northwestern University within the meaning of 820 ILCS 57 and 820 ILCS 115/2 within the past year.

80. Northwestern University has threatened to place, and has placed, a registration hold on

Plaintiffs as a means of coercing them into agreeing to incorporation of the IHRA definition in the University's discrimination policies and forcing them to listen to the University's religious and political views on antisemitism and Israel contained in its "Antisemitism Here/Now" training.

81. Northwestern induced certain student workers into completing the training course by threatening to revoke their student status, and thus their employment, unless they complete the training by October 20, 2025 or by February 2, 2026, depending on whether they preregistered for the Fall quarter prior to being placed on a registration hold. Many students did complete the training who would not have completed it absent that threat.

82. Beginning in the summer of 2025, Northwestern University has retaliated against Plaintiffs Tahboub and Ogbuli, as well as against members of Grad Workers for Palestine, for not completing the training by subjecting them to registration holds.

83. Northwestern University's Training is not intended to foster a civil and collaborative workplace or remedy discrimination but rather is aimed at suppressing political anti-Zionist speech and speech critical of Israel.

84. Defendant's conduct caused Plaintiffs and/or Plaintiff's members severe emotional distress, suffering, anguish, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the class members they represent, request relief against Defendant as follows:

1.      For declaratory relief that that Defendant's use of the IHRA definition of antisemitism, Antisemitism Here/Now training, and actions towards Plaintiffs as alleged herein are unlawful;

2.      For injunctive relief prohibiting Defendant from using the IHRA definition, prohibiting the use of the Antisemitism Here/Now training, and removal of discipline from Plaintiffs' student records attributable to Defendant's discriminatory policies and the enforcement thereof;

3.      For special and general damages;

4.      For emotional distress damages;

5.      For reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, 820 ILCS 57/20, and all other applicable statutes;

6.      For prejudgment and post-judgment interest as available by law; and

7.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves individually and on behalf of the class, hereby demand trial by jury in this action on all issues so triable.

## JURY DEMAND

Plaintiffs request a trial by jury with respect to any issues so triable.

DATED: October 15, 2025

Respectfully submitted,

Grad Workers for Palestine
Ifeayin Eziamaka Ogbuli
Marwa Tahboub

/s/ Rima Kapitan
/s/ M. Nieves Bolaños
/s/ Patrick Cowlin
/s/ Christina Abraham

KAPITAN GOMAA LAW, P.C.
Rima Kapitan (Atty No. 6286541)
Yusra Gomaa (Atty No. 6299883)
Hannah Moser (Atty No. 6349688)
P.O. Box 46503
Chicago, IL 60646
Phone: (312) 566-9590
rima@kapitangomaa.com

HAWKS QUINDEL S.C.
M. Nieves Bolaños (Atty No. 6299128)
Patrick Cowlin (Atty No. 6308800)
Illinois Attorney No.
111 E. Wacker Drive
Suite 2300
Chicago, IL 60601
Phone: (312) 224-2423
mnbolanos@hq-law.com

CAIR-CHICAGO
Christina Abraham (Atty No. 6298946 )
17 N. State St, Ste 1500
Chicago, IL 60602
Phone: (312) 212-1520
cabraham@cair.com