**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Northwestern Graduate Workers for Palestine (GW4P), Ifeayin Eziamaka Ogbuli (individually and on behalf of others similarly situated), and Marwa Tahboub (individually and on behalf of others similarly situated); | Case No. 1:25-cv-12614 |
| | Judge |
| Plaintiffs, | Magistrate Judge |
| v. | |
| Northwestern University, | |
| Defendant. | |

## APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

Table of Authorities.................................................................................................. ii

Exhibit List ........................................................................................................... iv

Notice to Defendant ............................................................................................... 1

I.  Introduction and Summary of Relief Sought ....................................................... 1

II. Standards for Injunctive Relief ......................................................................... 3

III. The Threshold Phase: Plaintiffs Can Establish Some
     Likelihood of Success and Irreparable Harm ................................................... 4

     A.  Likelihood of Success on the Merits ......................................................... 4

          1.  Northwestern Graduate Workers for Palestine has Standing to Sue ........... 4

          2.  Plaintiffs are Likely to Succeed on the Merits..................................... 5

               a.  Plaintiffs are likely to establish that the training course
                    is discriminatory in violation of Title VI and § 1981 ...................... 7

               b.  Plaintiffs are likely to establish a violation of the Freedom of Speech Act .......... 11

               c.  Northwestern retaliated against Plaintiffs who refused to sign the attestations,
                    watch the JUF video, and complete the require training described above .......... 13

     B.  Plaintiffs Have No Adequate Remedy at Law ........................................... 14

IV. The Balancing Phase: The Risk to Movants if Preliminary Relief is Denied
     is far Greater than the Risk to Northwestern ................................................. 18

Conclusion ........................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722 (7th Cir. 1998) ....................... 4

*Cassell v. Snyders*, 458 F. Supp. 3d 981 (N.D. Ill. 2020), *aff'd*, 990 F.3d 539 (7th Cir. 2021) .............. 4

*Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672 (N.D. Ill. 2006) .................................. 4

*Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988 (N.D. Ill. 2001) ...................................... 4

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079 (7th Cir. 2008) .... 4

*Illinois Republican Party v. Pritzker*, 973 F.3d 760  (7th Cir. 2020) .......................................... 4

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023) ........................................ 4

*Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir. 1986) ........................................ 5

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) .................... 5

*Runyon v. McCrary*, 427 U.S. 160 (1976) .................................................................... 6

*Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873 (7th Cir. 2022) .......................................... 6

*Morris v. Off. Max, Inc.*, 89 F.3d 411 (7th Cir. 1996) ...................................................... 6

*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987) .................................................... 6

*CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008) ..................................................... 6, 14

*Haynes v. Indiana Univ.*, 902 F.3d 724 (7th Cir. 2018) .................................................... 7

*Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874 (N.D. Ill. 2015) .......................................... 7

*Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009) .................................................. 8

*Lucas v. VHC Health*, 128 F.4th 213 (4th Cir. 2025) ..................................................... 14

*Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271 (2009) ...................... 14

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034
(7th Cir. 2017) ............................................................................................................ 15, 16

*Foodcomm Int'l v. Barry*, 328 F.3d 300(7th Cir. 2003) ............................................. 15

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................ 15

*Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chicago,* 56 F.4th 437 (7th Cir. 2022) ..................... 15

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ............................. 15, 20

*St-Hilaire v. Comm'r of Indiana Bureau of Motor Vehicles*, 711 F. Supp. 3d 1028 (S.D. Ind. 2024) ....... 15

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) ......................................................... 16

*Maria v. Loyola Univ. of Chicago Stritch Sch. of Med.,* 24 C 1698, 2025 WL 96482
(N.D. Ill. Jan. 14, 2025) ............................................................................................ 16

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153 (9th Cir. 2011) ........................ 16

*Okyem v. Noem,* 25-CV-2120, 2025 WL 2551137 (C.D. Ill. Apr. 21, 2025) ................ 16

*King v. DePauw Univ.,* 2:14-CV-70-WTL-DKL, 2014 WL 4197507
(S.D. Ind. Aug. 22, 2014) ......................................................................................... 16

## Statutes and Regulations

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ............................ Passim

Civil Rights Act of 1866, 42 U.S.C. § 1981 ............................................................. Passim

Illinois Worker Freedom of Speech Act ("Freedom of Speech Act"), 820 ILCS § 57/15 ..... Passim

56 Ill. Admin Code 300.460 ..................................................................................... 12-13

29 CFR § 1606.1 ........................................................................................................ 7

34 CFR § 100.7(e) ...................................................................................................... 7

**EXHIBIT LIST**

Exhibit 1 – Declaration of Micol Bez

    Exhibit 1-A – Critical Theory GA Position Offer (email)

    Exhibit 1-B – Required anti-bias training: notice of registration hold (email)

    Exhibit 1-C – Open Letter to Northwestern University re Training and Code of Conduct

Exhibit 2 – Declaration of Emma Cohen

Exhibit 3 – Declaration of Laura Gabriéla Jaliff

    Exhibit 3-A – Research Assistant Appointment Letter

    Exhibit 3-B – Open Letter to Northwestern University re Training and Code of Conduct

    Exhibit 3-C – Registration Hold Message (email)

    Exhibit 3-D – Notice of Past Due Training (Sexual Assault Prevention for Graduate Students) (email)

Exhibit 4 – Declaration of Sara Lee

    Exhibit 4-A – Correspondence re Completing Training Under Duress

Exhibit 5 – Declaration of Eden Melles

    Exhibit 5-A – Letter Offering Admission to Graduate School program in Political Science

    Exhibit 5-B – Letter re Fellowship (Externally Funded)

    Exhibit 5-C – Terms of Fellowship

    Exhibit 5-D – Next Steps Re Registration Hold (email)

    Exhibit 5-E – Final Message Re Registration Hold (email)

    Exhibit 5-F – Open Letter to Northwestern University re Training and Code of Conduct

Exhibit 6 – Declaration of Eziamaka Ogbuli

    Exhibit 6 -A – Ogbuli TA Job Offer and Description

    Exhibit 6-B – Registration Hold or Notice Details

    Exhibit 6-C – Next Steps Re Registration Hold (email)

Exhibit 7 – Declaration of Michael Peshkin

    Exhibit 7 – A – Minutes of the Faculty Assembly (April 21, 2025)

Exhibit 7-B – Letter to the Editor

Exhibit 8 – Declaration of Marwa Tahboub

       Exhibit 8 – A- 2021 Admission Letter

       Exhibit 8-B – Tahboub TA Job Offer and Description

       Exhibit 8-C – Open Letter to Northwestern University re Training and Code of Conduct

       Exhibit 8-D – Next Steps Re Registration Hold (email)

Exhibit 9 - Declaration of Rebecca Zorach

       Exhibit 9-A – Letter to President Schill, et al. Re Against Punishment for Students Declining to Participate in Flawed Training

The plaintiffs ("Plaintiffs"), through undersigned counsel, move for a temporary restraining order and order to show cause why a preliminary injunction should not issue enjoining Defendant Northwestern University ("Defendant," "Northwestern," or "the University") from discontinuing the academic program and terminating the student affiliation of students who refuse to 1) complete a training establishing an unscholarly, discriminatory, and overly broad definition of antisemitism and 2) agree to be subject to a code of conduct that adopts a similar overly broad definition of antisemitism, both in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("the Civil Rights Act of 1866"); and the Illinois Worker Freedom of Speech Act ("Freedom of Speech Act"), 820 ILCS § 57/15. As described herein, students and faculty have already formally requested the relief sought, but Defendant has refused.

## Notice to Defendant

Counsel for Plaintiffs and counsel for Defendants are in communication. Defendant's Counsel has a copy of the Complaint, has waived service of a summons (Doc. #6), and Plaintiff's counsel will provide Defendant's counsel with a copy of this application as soon as possible after it is filed.

## I.       Introduction and Summary of Relief Sought

Plaintiffs incorporate all facts set forth in their Complaint. Doc. #1. Defendant is a not-for-profit university whose main campus is located in Evanston, Illinois. Doc. #1 ¶ 16. Northwestern receives financial assistance from the United States Government. *Id.* Plaintiffs are Arab and non-Arab undergraduate students, graduate students, and a student organization, Northwestern Graduate Workers for Palestine ("Grad Workers for Palestine"), at Northwestern University who are antizionist. Doc. #1 ¶¶ 13-15; *see generally* Ex. 6 and 8 (Declarations of Plaintiffs Ogbuli and Tahboub); Ex. 1, 3-5 (Declarations of Bez, Jaliff, Lee, and Melles).

The University has adopted a discriminatory definition of antisemitism and incorporated it into policies that govern its relationship with its students. Ex. 8 ¶ 6; Doc. #1 ¶ 41 (citing to https://www.northwestern.edu/provost/federal-updates/antisemitism.html). Northwestern requires students to complete a training course elaborating on that definition and requires them to attest that they agree to abide by conduct policies that incorporate that discriminatory definition ("the Attestations"). *See e.g.* Ex. 1-B; Ex. 6-C; Ex. 8-D. The training course and Attestations discriminate against Arab students whose racial and national origin identities are fundamentally incompatible with this definition, discriminate against Jewish students who are antizionist, and constitute associational discrimination against students in solidarity with them. Ex. 8-C (Open Letter to NU).

Students protested that the training course and Attestations were discriminatory, and the administration retaliated by threatening to terminate the student affiliation of those who refuse to complete the training. *See e.g. id.* The administration refused several student and faculty proposals for resolution. *See* Ex. 7-A (detailing faculty resolution supporting Plaintiffs' position); Ex. 9 (Zorach Dec.).

The training course also violates the Freedom of Speech Act by threatening the jobs of student workers who decline to participate in the training and by inducing them to listen to the University's political and religious opinions. Students who did not preregister for the Fall before the University issued registration holds for refusing to complete the training decline to undergo the training and adhere to the discriminatory definition of antisemitism face revocation of their student status by **October 20, 2025**. *See e.g.* Ex. 1-B; Ex. 6-C; Ex. 8-D.

Plaintiffs seek emergency injunctive relief to prevent irreparable harm resulting from (1) the loss of student status for students who decline to complete the discriminatory training and sign the Attestations, (2) the loss of employment for student workers who refuse to complete the discriminatory training and sign the attestations, (3) the threat of discipline to students for violations

of the University's discriminatory definition of antisemitism, and (4) students' resulting inability to advocate for the national and human rights of Palestinians and to express their Jewish religious identity in a manner that rejects Zionist conquest.

Specifically, Plaintiffs ask 1) that Northwestern be ordered to refrain from conditioning student status, registration, and employment on completing the attestations in the Building a Community of Respect and Breaking Down Bias training and watching the "Antisemitism Here/Now" video, created in collaboration with an organization devoted to silencing criticism of the State of Israel ("the JUF video"), and 2) that Northwestern be ordered to withdraw the definition of antisemitism it has incorporated into its official policies (i.e. as defined by the International Holocaust Remembrance Alliance ("IHRA definition")), including from its Student Code of Conduct and the Policy on Discrimination, Harassment and Sexual Misconduct. *See* Ex. 8 ¶ 6; Doc. #1 ¶ 41; Ex. 2 (Cohen Dec., including link to training video). Granting Plaintiffs' requested relief will not subject any students to harm because Defendant's remaining policies will still prohibit illegal discrimination, including antisemitism, but without the harm to Plaintiffs described herein.

## II.      Standards for Injunctive Relief

The purpose of preliminary injunctive relief is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). The standards for issuing temporary restraining orders and preliminary injunctions are the same. *Cassell v. Snyders*, 458 F. Supp. 3d 981, 990 (N.D. Ill. 2020), *aff'd*, 990 F.3d 539 (7th Cir. 2021) (Lee, J.) (internal citation omitted); *Int'l Profit Assocs., Inc. v. Paisola*, 461 F. Supp. 2d 672, 675 (N.D. Ill. 2006) (Bucklo, J.); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (Gottschall, J.).

The decision about whether injunctive relief is warranted proceeds in two distinct phases: a threshold phase and a discretionary balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of*

*U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). In the threshold phase, the movant must

establish 1) "some likelihood of succeeding on the merits" and (2) that it has "no adequate remedy

at law" and will suffer irreparable harm if preliminary relief is denied. *Cassell v. Snyders*, 990 F.3d 539,

544–45 (7th Cir. 2021). Plaintiffs need not establish likelihood of success by a preponderance of the

evidence but rather must make a "strong" showing that reveals how they propose to prove key

elements of their case. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

Likelihood of success on the merits and irreparable harm are the two most important

considerations in determining whether to issue a preliminary injunction. *Bevis v. City of Naperville,

Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023).

If the court is satisfied that all elements are sufficiently demonstrated, it then proceeds to the

"balancing" phase, during which the court evaluates the likely effect on the parties and the public

from the grant or denial of injunctive relief. *Id.* In that evaluation, the court must decide in "what

direction the balance of equity tips, through a subjective evaluation of the import of the various

factors and a personal, intuitive sense about the nature of the case." *Lawson Products, Inc. v. Avnet, Inc.*,

782 F.2d 1429, 1436 (7th Cir. 1986). Plaintiffs easily satisfy the standard for preliminary relief here.

### III.    The Threshold Phase: Plaintiffs Can Establish Some Likelihood of Success and Irreparable Harm.

#### A.    Likelihood of Success on the Merits.

1.    <u>Northwestern Graduate Workers for Palestine has standing to sue</u>.

Northwestern Graduate Workers for Palestine ("Grad Workers for Palestine") is a student

organization at Northwestern. An organization may litigate to enforce the rights of its members.

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199–200 (2023). To

demonstrate such standing, an organizational plaintiff must show that "(a) its members would

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to

the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 199 (citation omitted).

The training is mandatory for all Northwestern students. Ex. 3 ¶ 3 (Jaliff Dec.). Because Grad Workers for Palestine is a student organization, its members would have standing to sue. Several of the students who signed an open letter to the Northwestern administration alleging that the training is discriminatory are members of Grad Workers for Palestine. *E.g. id.* ¶ 4; Ex. 3-B (Open Letter to NU); Ex. 1 ¶¶ 13-15; Ex. 4 ¶ 2. Moreover, the rights they seek to protect are germane to the organization's purposes, since the organization seeks to advocate for justice in Israel/Palestine. *Id.* Finally, because Grad Workers for Palestine challenge a universally applicable policy, resolution of its claims and the temporary relief requested do not depend on participation of the individual members. All members face revocation of their student status and have been forced or will soon be forced to comply with discriminatory training or lose their student status. Ex. 1, 4.

2. <u>Plaintiffs are likely to succeed on the merits</u>.

Plaintiffs are likely to be able to show that the training course discriminates against Arab students, that Northwestern's refusal to allow students to opt out of the training was retaliatory, and that it violates the Freedom of Speech Act. Plaintiffs Tahboub and Grad Workers for Palestine will likely show that Northwestern retaliated against them for alleging in an open letter that the training course is discriminatory. Plaintiffs will likely show that the training course itself is discriminatory and requires students to attend and participate in a meeting which imposes a political and religious view.

The Civil Rights Act of 1866 prohibits conditioning contractual relationships on race. 42 U.S.C. § 1981. In particular, for a private educational institution to offer admission to students of one race but not to students of another race is a violation of the Civil Rights Act of 1866, 42 U.S.C.A. § 1981. *Runyon v. McCrary*, 427 U.S. 160, 172–74 (1976). The relationship between a university and its students is a contractual one whose terms are defined by the University's "catalogs, bulletins,

5

circulars, regulations, and other publications, and customs." *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 883 (7th Cir. 2022) (internal citations omitted).

To establish a claim under § 1981, the plaintiffs must show that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract). *Morris v. Off. Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). The Civil Rights Act of 1866 protects individuals of Arab ancestry. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Section 1981 provides all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . ." 42 U.S.C. § 1981(a). This right protects not only an equal right to enter into a contract in the first place but equal rights in the "making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(b). Section 1981's prohibition against discrimination encompasses retaliation claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008). Injunctive relief is available as a remedy for Section 1981 violations. *Haynes v. Indiana Univ.*, 902 F.3d 724, 731 (7th Cir. 2018).

Similarly, Title VI prohibits universities from denying students participation in their programs "on the ground of race, color, or national origin." 42 U.S.C. §§ 2000d, §2000d–4a(2)(A). Title VI empowers students to bring private actions seeking injunctive relief to enforce § 601 of Title VI of the Civil Rights Act of 1964 ("Title VI"). *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).

Title VI's prohibition of discrimination on the basis of national origin includes protection for the right of national origin groups to advocate for the rights of their national origin groups. The Code of Federal Regulations recognizes a broad conceptualization of national origin discrimination which prohibits denial of equal opportunity for reasons such as "(b) membership in, or association with an organization identified with or seeking to promote the interests of national origin groups; [or] (c) attendance or participation in schools, churches, temples or mosques, generally used by persons of a

national origin group." 29 CFR § 1606.1. Title VI's prohibition against discrimination encompasses retaliation claims. *Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889–90 (N.D. Ill. 2015) (Kennelly, J.) (collecting cases); 34 CFR § 100.7(e).

The Freedom of Speech Act prohibits penalizing employees for declining to attend or otherwise participate in an employer-sponsored meeting or communication "if the meeting or communication is to communicate the opinion of the employer about religious matters or political matters." 820 ILCS 57/15. The Freedom of Speech Act allows workers to obtain injunctive relief on behalf of themselves and "other employees similarly situated." 820 ILCS 57/20. The Freedom of Speech Act does not apply to trainings "intended to foster a civil and collaborative workplace or reduce or prevent workplace harassment or discrimination." 820 ILCS 57/35(4).

> a. *Plaintiffs are likely to establish that the training course is discriminatory in violation of Title VI and Section 1981.*

Northwestern's training course discriminates against Arab students in two ways. First, Northwestern forces a discriminatory contract term on Arab students – one that requires them to agree to student conduct policies which endorse colonization of their land and the erasure of their people. *See* Ex. 1, 3-6, 8. Second, and relatedly, the training course requires students to complete a training that includes a video ("the JUF video") characterizing criticism of Zionism and broad categories of Israeli state practices as antisemitic and therefore contrary to the University's discrimination policies. *Id.* As such, the University adopts and imposes on students an interpretation of its discrimination policies (akin to a regulation) that is itself discriminatory.

Prohibiting discrimination against ethnic or racial groups entails not only protecting their right to exist as students of a particular ethnicity but allowing them to affirm their own humanity and engage in expressions of culture and identity without fear of discipline. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) ("Section 1981 also prohibits discrimination based . . . advocacy for non-whites"); 29 CFR § 1606.1.

Northwestern bars Arabs from maintaining a contractual relationship with the University unless they agree to abandon cultural expressions and norms inherent to their identities. *See* Ex. 8 at §§ 3, 11-14. Northwestern's claim that the training is not discriminatory but simply seeks to prevent anti-Jewish discrimination is pretextual, because much of the content has nothing to do with anti-Jewish discrimination. The IHRA definition characterizes as antisemitic broad categories of non-discriminatory political speech regarding the Israeli state and its policies. For example, it identifies "[c]ontemporary examples of antisemitism" that include "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor" and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis."[1] Similarly, the JUF video fails to define "the Jewish right of self-determination" but claims it is antisemitic to deny Jews that right. Ex. 8. The IHRA definition and the JUF conceptualize the "Jewish right of self-determination" as permitting all Jews everywhere to reside in and exercise political agency in Israel/Palestine, a standard that is far from being a generally accepted principle of legal and political theory.[2] Zionists have exercised that claimed "right of self-determination" to establish a system of exclusion, colonization and discrimination against most of the indigenous population,[6] proclaiming in Israel's Basic Law that "[t]he realization of the right to national self-determination in the State of Israel is exclusive to the Jewish People." Ex. 5 at § 14.

In service of that principle, Israel has depopulated more than 400 non-Jewish villages and expropriated property for exclusive Jewish use;[3] blocked refugees from returning to their homes;[4]

---

[1] *See* https://holocaustremembrance.com/resources/working-definition-antisemitism

[2] Margaret Moore, *Territorial Rights and Territorial Justice*, Stanford Encyclopedia of Philosophy (*First published Tue Mar 24, 2020; substantive revision Wed Oct 23, 2024*), available at https://plato.stanford.edu/entries/territorial-rights/#EthnGrouTheoTerrKole

[3] ILAN PAPPE, THE ETHNIC CLEANSING OF PALESTINE 39-41 (2006); *see also* DAVID HIRST, THE GUN AND THE OLIVE BRANCH 248-49 (3d Ed. 2003); *see also* WALID KHALIDI, Ed., ALL THAT REMAINS (1992).

[4] Omar Shakir, *75 Years Later, Israel Blocking Palestinian Refugees' Return*, Human Rights Watch (May 15, 2023), https://www.hrw.org/news/2023/05/15/75-years-later-israel-blocking-palestinian-refugees-return (last accessed October 15, 2025).

imposed a system of military occupation and blockade in the West Bank and Gaza;[5] suppressed

dissent;[6] imprisoned thousands without charge or trial, including children;[7] blocked the population

from access to humanitarian aid;[8] killed well over 100,000 Palestinians in the last two years alone;[9]

and demolished nearly all of Gaza.[10]

    Plaintiff Marwa Tahboub has watched this erasure of her people but is prohibited from

questioning the political ideology which fuels it on campus without subjecting herself to discipline.

Ex. 8. Through the training, Northwestern is requiring Tahboub to affirmatively agree that critique

of a political ideology which erases her national group is antisemitic and will subject her to discipline.

*Id.*

---

[5] Human Rights Watch, *Threshold Crossed: Israeli Authorities and the Crimes of Apartheid and Persecution* (April 27, 2021), available at https://www.hrw.org/report/2021/04/27/threshold-crossed/israeli-authorities-and-crimes-apartheid-and-persecution

[6] United Nations General Assembly, *Report of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories* at p. 7/27, available at https://docs.un.org/en/A/79/363 (last accessed October 15, 2025).

[7] Defense for Children International Palestine, *41 percent of Palestinian child detainees have no charges* (September 2, 2025), available at https://www.dci-palestine.org/children_in_israeli_administrative_detention (last accessed October 15, 2025); B'Tselem, the Israeli Information Center for Human Rights in the Occupied Territories, *Statistics on administrative detention in the Occupied Territories* (March 3, 2025), available at https://www.btselem.org/administrative_detention/statistics (last accessed October 15, 2025).

[8] Euro-Med Human Rights Monitor, Gaza: *After ICJ order to halt attacks on Rafah, Israel launches over 60 air raids on the city in 48 hours*, May 26, 2024, https://euromedmonitor.org/en/article/6348/Gaza:-After-ICJ-order-to-halt-attacks-on-Rafah,-Israel-launches-over-60-air-raids-on-the-city-in-48-hours (last accessed October 15, 2025); United Nations Security Council, *Press Statement on Humanitarian Workers and Threat of Famine in Gaza*, MEETINGS COVERAGE AND PRESS RELEASES, April 11, 2024, https://press.un.org/en/2024/sc15658.doc.htm (last accessed July 4, 2024); @itamarbengvir, X, (October 17, 2023, 1:00 p.m.), https://twitter.com/itamarbengvir/status/1714340519487176791 (last accessed July 5, 2024) (Minister of National Security Itamar Ben Gvir: "As long as Hamas does not release the hostages it is holding - the only thing that needs to enter Gaza is hundreds of tons of explosives by the Air Force, and not an ounce of humanitarian aid.") (last accessed October 15, 2025); U.N. Special Comm. to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People & Other Arabs of the Occupied Territories, Report, U.N. Doc. A/79/363 (Sept. 20, 2024) https://www.ohchr.org/en/documents/thematic-reports/a79363-report-special-committee-investigate-israeli-practices-affecting (last accessed October 15, 2025.

[9] Rasha Khatib, Martin McKee·and Salim Yusuf, Counting the dead in Gaza: difficult but essential, The Lancet (July 10, 2024), available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736%2824%2901169-3/fulltext?utm

[10] Enas Tantesh, *Two years of displacement and destruction in Gaza – photo essay*, The Guardian (October 9, 2025), https://www.theguardian.com/world/2025/oct/09/two-years-of-displacement-and-destruction-in-gaza-photo-essay (last accessed October 15, 2025)

The IHRA definition and JUF video are designed to establish a political orthodoxy on campus about the state of Israel, one which erases Palestinians. The IHRA definition effectively limits Arab students, and particularly Palestinian students, in their expressions of nationalist aspirations and protest against mistreatment of their ethnic group. Under the IHRA definition, for example, "claiming that the existence of a State of Israel is a racist endeavor" is antisemitic. While other groups on campus can draw comparisons between their circumstances and past injustices, and advocate for national liberation and equality, Palestinians at Northwestern may not. While other groups on campus are permitted to expose and discuss racism when they perceive it, Palestinians may not.

Kenneth Stern, one of the drafters of the IHRA definition, criticized its misuse, writing, "Unfortunately, . . . the working definition has been primarily used (and I argue, grossly abused) to suppress and chill pro-Palestinian speech."[11] In written testimony before the United States House of Representatives Committee on the Judiciary on November 7, 2017, he explained,

> Imagine a definition designed for Palestinians. If "Denying the Jewish people their right to self-determination, and denying Israel the right to exist" is antisemitism, then shouldn't "Denying the Palestinian people their right to self-determination, and denying Palestine the right to exist" be anti-Palestinianism? Would they then ask administrators to police and possibly punish campus events by pro-Israel groups who oppose the two state solution, or claim the Palestinian people are a myth?[12]

Far from banning its students from denying the Palestinian right to self-determination, the training course makes no mention of such a right, and the JUF video negates it. Ex. 5 at ¶ 14.

The JUF video also discriminates against Jews. Antizionist Jews have a long cultural tradition of rejecting Zionism. As Northwestern professors Michael Peshkin and Elizabeth Hurd pointed out, "The claim that 'Jews are from Israel' erases centuries of Jewish life around the world and plays into

---

[11]https://www.jewishvoiceforlabour.org.uk/article/the-ihra-definition-revisited-by-its-lead-drafter/?utm_source=chatgpt.com
[12]https://kennethsstern.com/wp-content/uploads/2019/02/Kenneth-Stern-Testimony-House-Judiciary-Committee-110717.pdf

antisemitic stereotypes that diaspora Jews are disloyal." Ex. 7 at ¶ 4, 7-B. The JUF video places antizionist Jews in the bizarre position of being branded "antisemitic" (and disciplined accordingly) for opposing the Zionist views that "most people" who are Jewish allegedly espouse. Ex. 2 at ¶ 4.

       *b.   Plaintiffs are Likely to Establish a Violation of the Freedom of Speech Act.*

The Freedom of Speech Act covers the individual Plaintiffs, who work for Northwestern as graduate student teaching assistants, and whose employment is conditioned on their status as Northwestern students. Ex. 6, 8. Grad Workers for Palestine's members are similarly covered employees. Ex. 1, 3, 5, 6, 8. The Freedom of Speech Act protects covered employees and defines "employers" and "employees" in the same broad way as the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/2. 820 ILCS 57/10. An "employer" is any individual, business, or organization that makes wage payments and for which one or more persons is "gainfully employed." 820 ILCS 115/2. An "employee" is anyone permitted to work for an employer, except for an individual:

    (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

    (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and

    (3) who is in an independently established trade, occupation, profession or business.

*Id.* All three of the above elements regarding independent contractors must be established for someone who performs work *not* to be considered an employee. *Id.* None of the above elements are met here.

The individual Plaintiffs work for Northwestern as teaching assistants and, in exchange, Northwestern pays them wages. Northwestern, therefore, is clearly an employer under the Freedom of Speech Law. Plaintiffs are also employees because their work is done under the supervision and

control of the professors and administrators they work for within the bounds of Northwestern's rules. *See e.g.* Ex. 8, 8-B (Tahboub TA Job Offer and Description);  Ex. 6-A (Ogbuli TA Job Offer and Description); 56 Ill. Admin Code 300.460 ("'Control' means the existence of general control or right to general control, even [if] the details of work are left to an individual's judgment.").

Plaintiffs' work is to engage in research or assist in the education of Northwestern undergraduate students and as a university, Northwestern exists primarily to conduct research and provide individuals with an education. *Id.* Plaintiffs' work is also conducted on Northwestern's campus. *See id.* Finally, teaching assistants' work takes place within the ecosystem of the university, not as an independently owned and operated business Plaintiffs could otherwise sell or transfer, for example. 56 Ill. Admin Code 300.460 ("An 'independently established trade, occupation, profession or business' means the individual performing the services has a proprietary interest in such business, to the extent that he/she operates the business without hindrance from any other person and, as the enterprise's owner, may sell or otherwise transfer the business.); *see* Ex. 8-B, 6-A. Other graduate student workers in the putative class also work as teaching assistants, research assistants, and/or similar titles, all of which are subject to control by Northwestern, operate on campus, and are not independent trades/businesses. Ex. 1 and 1-A; 3 and 3-A; 5 and 5-A, 5-B, 5-C.

Plaintiffs and the class are covered by the Freedom of Speech Act and would also likely establish that Northwestern violated that law. As described in detail herein and in the Complaint, the training at issue offers Northwestern's sanctioned viewpoints and opinions about both religious and political matters. For example, the training specifies Northwestern's opinion and directive on what are acceptable ways to interpret Jewish students' religious beliefs and political viewpoints regarding the nation of Israel. Doc. #1 ¶¶ 41-42, 46-59; Ex. 2 (Cohen Dec., including link to training video). As such, Northwestern cannot mandate the training as a condition of employment. 820 ILCS 57/15 (employer cannot take adverse action because employee does not attend meeting about or refused to

listen to employer's religious or political beliefs, nor can employer use the threat of adverse action to induce attendance). Because teaching assistants and those with similar job titles must be students to work and Northwestern requires all students to complete the training and attest to its related policies, or else have their student status revoked, Northwestern conditions Plaintiffs' employment on completing the training in violation of the Freedom of Speech Act. Plaintiffs' claims are straightforward and uniformly applicable to similarly-situated individuals. Therefore, there is a strong likelihood that Plaintiffs will succeed on their Freedom of Speech Act claims.

> c.  *Northwestern retaliated against Plaintiffs who refused to sign the attestations, watch the JUF video and complete the required training described above.*

To establish Title VI retaliation, students must show (1) that they engaged in protected activity; (2) that the university imposed an adverse action on them, and (3) that a causal connection existed between the protected activity and the adverse action. *Lucas v. VHC Health*, 128 F.4th 213, 225 (4th Cir. 2025). Retaliation includes actions that "intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act." 34 CFR § 100.7(e). Section 1981 protects the right of all persons to make and enforce contracts regardless of race, and also authorizes retaliation claims. *Humphries*, 553 U.S. at 445.

Defendant has placed "on hold" the registrations of students who have refused to complete the training and sign attestations in opposition to its discriminatory content, meaning they are barred from registering, adding, dropping or attending classes, and if they remain unregistered, they will not be permitted to live in campus housing, access campus facilities, or receive financial aid, including Federal Work study allocations, and some may face impacts to their J-1 or F-1 visas. Ex. 1, 3-6, 8; 8-D. This conduct is protected. *Cf., Crawford v. Metro. Gov't of Nashville & Davidson County,* 555 U.S. 271, 277 (2009) (Stating in a Title VII case that "standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons" is protected opposition conduct). As such, they have experienced unlawful retaliation for their protected opposition to Defendant's

13

discriminatory training program, and they will suffer further retaliation and significant and irreparable harm if this policy is not immediately rescinded. Additionally, the threat of disciplinary action is itself intimidating, coercive and retaliatory. 34 CFR § 100.7(e). Plaintiffs have a high likelihood of success on their retaliation claims such that preliminary relief must be granted.

Several circumstances point to Defendant's retaliatory motive. First, the severity of the punishment of students who do not complete the training stands in stark contrast to the University's apathy towards students who did not complete a mandatory Sexual Assault Prevention for Graduate Students training. Declarants Melles and Jaliff did not complete that training and Northwestern neither threatened nor took action against their student status as a result. Ex. 5 at § 9; Ex. 3 at § 10.

Second, the University threatened and punished students even after they took the time to repeatedly meet and correspond with University officials; explained the legal, moral, and ethical grounds for their decisions; signed an open letter; and attempted to negotiate compromises. Ex. 3 at §§ 11-17; Ex. 1 at § 17. Faculty also decried the severity of the punishment, wrote letters to the administration expressing concerns about the training, and passed a resolution through the Faculty Assembly voting by a vote of 338 to 83, resolving that "Northwestern shall not limit speech, scholarship or criticism of any nation or government. . . . [nor] require anyone to view the video on antisemitism and Islam, 'Building a Community of Respect and Breaking Down Bias.'" Ex. 7 at ¶ 3, 7-A; Ex. 9 at ¶ 3, 9-A. The fact that Northwestern's administration was impervious to these attempts at reason and negotiation shows their hostility to Plaintiffs and their protected activity.

### B. Plaintiffs Have No Adequate Remedy at Law.

Movants seek relief for loss of expressive rights of the type that have no adequate remedy at law. To establish entitlement to a preliminary injunction, the moving parties must demonstrate that absent a preliminary injunction, they have no adequate remedy. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). This does not require a

demonstration that the remedy would be "wholly ineffectual," but rather "that any award would be "seriously deficient as compared to the harm suffered." *Id.* (citing *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)).

When the plaintiffs are not seeking to remedy past harm but *prospective* or ongoing harm, money damages are not an adequate remedy. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017).

The type of harm at issue here is ongoing and is analogous to the loss of speech rights in the First Amendment context. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861-62 (7th Cir. 2006)) ("When the government forces a group to accept for membership someone the group does not welcome and the presence of the unwelcome person 'affects in a significant way the group's ability to advocate' its viewpoint, the government has infringed on the group's freedom of expressive association.")

Further, some courts have found that the presumption of irreparable harm also applies to equal protection violations, reasoning that equal protection guarantees "protect 'intangible and unquantifiable interests.'" *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1040 (S.D. Ind. 2018) (Lawrence, J.) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)). Irreparable harm was also found when individuals were not allowed to be sworn into the Marine Corps unless they surrendered their sincerely held beliefs and practices related to their religious headwear. *Singh v. Berger*, 56 F.4th 88, 109–10 (D.C. Cir. 2022).

The Seventh Circuit has also held, "The loss of opportunity to pursue one's chosen profession due to alleged discrimination is widely recognized as constituting an irreparable injury." *Maria v. Loyola Univ. of Chicago Stritch Sch. of Med.*, 24 C 1698, 2025 WL 96482, at *8 (N.D. Ill. Jan. 14, 2025)

15

(Ellis, J.) (citing *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165–66 (9th Cir. 2011)). The Court recently found that a student at risk of losing F-1 status had their education, research, financial stability, and career trajectory placed at imminent risk of irreparable harm. *Okyem v. Noem,* 25-CV-2120, 2025 WL 2551137, at *4 (C.D. Ill. Apr. 21, 2025) (Bruce, J.). Additionally, the court found irreparable harm when a transgender student was faced with the choice between using a bathroom that would further stigmatize him and cause him to miss class time, or avoid using the bathroom altogether at the expense of his health. *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034 (7th Cir. 2017) *abrogated on other grounds as recognized by, Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

The Court has found that having a gap or transfer on a student record inevitably leads to questions by other academic institutions or potential future employers as to why that is, and if the answer has an associated stigma, then that is an irreparable harm. *King v. DePauw Univ.,* 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (Lawrence, J.). The court observed:

> Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding [of sexual misconduct]. Money damages would not provide an adequate remedy at that point; DePauw's disciplinary finding—even if determined to have been arbitrary or made in bad faith—would continue to affect him in a very concrete way, likely for years to come.

*King v. DePauw Univ.,* 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (Lawrence, J.).

Here, there is no adequate remedy at law if this litigation proceeds without preliminary injunctive relief. Northwestern is forcing Movants to choose between the revocation of their student status or signing onto a discriminatory training that is contrary to their identities and/or violates their conscience. *See* Ex. 1, 3-6, 8. If they lose their student status, they will face exclusion from classes, loss of employment, interruption and destruction of ongoing research projects, loss of scholarships, loss of career opportunities, loss of research opportunities, loss of student visas, and potentially

permanent exclusion from Northwestern. *Id.*; Ex. 4-A. Laura Jaliff, a doctoral student and Research Assistant in Northwestern University's Civil and Environmental Engineering Program, will be blocked from access to her lab and her ongoing experiments will be ruined. Ex. 3. at ¶¶ 1, 7. She cannot easily transfer her research to another university; it took her five years to build the infrastructure to equip her lab specifically for the set of experiments required for her work. Ex. 3 at ¶ 8. If they instead take the training course, Movants will be precluded from engaging in certain types of scholarly and political discourse on campus, precluded from preserving their identities and advocating for the rights of their national origin groups, precluded from expressing solidarity with Palestinians and antizionist Jews; and precluded from exposure to views that fail to conform to the training. Ex. 1, 3-6, 8. Micol Bez testifies that she and other members of Grad Workers for Palestine have already refrained from academic and political discourse on campus because of the new prohibitions. Ex. 1 ¶ 15. Sarah Lee, another member of Grad Workers for Palestine, completed the training and signed the Attestations under duress, after voicing her specific concerns about discrimination, because she could not risk losing her academic progress and funding for her doctoral work. Ex. 4.

These students are invested in their communities at Northwestern and seek to continue their education there. For example, for Eden Melles, loss of student status will lead to the permanent loss of her fellowship. Ex. 5, 5-D, 5-E. Having to explain the gap in their records could also result in stigma, leading to long-lasting consequences.

Plaintiffs should be able to retain their student status and continue pursuing their educations at Northwestern while this case is litigated, as they will suffer the irreparable harms of loss of student status or forced political conformity and loss of the ability to express their identities and speak in accordance with their conscience.

## IV. The Balancing Phase: The Risk to Movants if the Preliminary Relief is Denied is Far Greater than the Risk to Northwestern.

Movants face imminent loss of student status or the requirement of participating in a training that violates their civil and employment rights. Ex. 1 at ¶¶ 1 3, 5, 6; Ex. 3 at ¶¶ 5-8. For Bez, Ogbuli, Jaliff, and Melles, they will lose their student status if they do not complete the training by October 20, 2025. Northwestern encourages reporting of violations of its discrimination policy. While the guidance in the training course is in place and students know it represents University policy, students who want to suppress criticism of Israel or expressions of Palestinian identity and advocacy are likely to file disciplinary complaints against their peers. Ex. 3 at ¶ 3.

Plaintiffs feel so strongly about the harms of the training that they have repeatedly refused to comply with the administration's instructions about the training despite repeated threats. Ex. 1 at ¶ 4; Ex. 5 at ¶ 5; Ex. 8 at ¶ 3. Eden Melles writes,

> I am worried about personal, academic and professional repercussions that may result from my participation in this case. However, I feel strongly that someone needs to challenge the deeply discriminatory and repressive antisemitism training that Northwestern University is imposing on us, which is why I am submitting this declaration. I do not consent to becoming complicit in the normalization on campus of the dehumanization of Palestinians and Arabs, nor can I in good conscience become a party to prohibiting Jewish students from deciding for themselves the contours of their identities and cultures.

*Id.*

Northwestern is likely to argue that if this Court grants preliminary relief, it will be unable to ensure its Jewish students are protected from discrimination. Northwestern may also argue that it faces loss of federal funding if it is found to be in violation of Title VI.

Neither of these concerns justify unenrolling students or barring them from advocacy for national origin groups. Plaintiffs are likely to be able to establish that Northwestern does not really believe its training necessary for the protection of its Jewish students; former President Schill

testified that he thinks Northwestern's antisemitism policies go beyond Title VI.[13] Meanwhile, Interim President Bienen wants to do away with trainings completely. Ex. 7 at ¶ 5. Title VI does not require universities to impose on their students political trainings created in partnership with the Jewish United Fund. Moreover, Northwestern requires no such training of its faculty, and faculty do not even have access to the training course. Ex. 9 at ¶ 2. Northwestern did not create a specialized video for groups other than Jews, Arabs, Muslims, and Palestinians, though it presumably does not claim inability to protect against discrimination of those other groups. Nor is adherence to the IHRA definition a necessary component of Title VI, and indeed it seeks to impose several political principles which have nothing to do with discrimination against Jews. President Trump's Executive Order, on which Northwestern relies in imposing the definition, itself describes the IHRA definition as "non-legally binding."[14]

Further, fear of loss of federal funding is no excuse for violating the civil rights of students. Northwestern suffers no hardship if imposing the training means violating the civil rights of its students. In *Walker*, the 7th Circuit emphasized that it was not a hardship "to recognize a student organization it believes is violating the university's antidiscrimination policy," if it was "applying that policy in a manner that violates [the plaintiff's] First Amendment rights." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). The remedy for illegal demands from Congress is to initiate litigation, rather than putting that burden on students, as the Faculty Assembly pointed out. Ex. 7 at ¶ 3, 7-A.

---

[13] Committee on Education and Workforce, Interview of: Michael Harry Schill August 5, 2025, at 41:12-14, *available at* https://edworkforce.house.gov/uploadedfiles/edworkforce_final_transcript_aug_5_2025_redacted.pdf (last accessed October 15, 2025).

[14] Executive Order on Combating Anti-Semitism, Executive Order 13899, December 11, 2019, available at https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-combating-anti-semitism/

The risk to Movants of denying preliminary relief is far greater than the risk to Northwestern of not including the JUF video and conditioning student status on attesting to the IHRA definition. President Bienen's comments underscore that Northwestern has no great interest in maintaining the training program and attestation requirements, let alone the arbitrary October 20, 2025 deadline, in stark contrast to the grave harms faced by Plaintiffs and similarly-situated individuals.

## Conclusion

Plaintiffs, on behalf of themselves and similarly-situated individuals, have met the standard for a temporary restraining order and ongoing preliminary relief to be entered during the pendency of this matter.

WHEREFORE, Grad Workers for Palestine, Ifeayin Ogbuli, and Marwa Tahboub respectfully request entry of a temporary restraining order requiring Northwestern University to:

1. Refrain from any further requirement that students participate in the training course and sign the Attestations.

2. Remove the registration holds from the records of students for whom the sole reason for the registration holds is their declining to complete the training course.

3. Refrain from implementing the IHRA definition as part of Northwestern's Code of Conduct or otherwise relying on the IHRA definition to discipline students or restrict their speech;

4. Allow students who completed the training course under duress to revoke their agreement to adhere to a version of the Code of Conduct that incorporates the IHRA definition or the explanation of antisemitism in the JUF video; and

5. Send a communication to all students announcing the temporary restraining order and providing a copy of the order.

DATED: October 16, 2025

Respectfully submitted,

Plaintiffs Grad Workers for Palestine,
Ifeayin Eziamaka Ogbuli, and Marwa Tahboub


 /s/ Rima Kapitan

/s/ M. Nieves Bolaños

/s/ Patrick Cowlin

/s/ Hannah Moser


KAPITAN GOMAA LAW, P.C.
Rima Kapitan (Atty No. 6286541)
Yusra Gomaa (Atty No. 6299883)
Hannah Moser (Atty No. 6349688)
P.O. Box 46503
Chicago, IL 60646
Phone: (312) 566-9590
rima@kapitangomaa.com

HAWKS QUINDEL S.C.
M. Nieves Bolaños (Atty No. 6299128)
Patrick Cowlin (Atty No. 6308800)
Illinois Attorney No.
111 E. Wacker Drive
Suite 2300
Chicago, IL 60601
Phone: (312) 224-2423
mnbolanos@hq-law.com

CAIR-CHICAGO
Christina Abraham (Atty No. 6298946)
17 N. State St, Ste 1500
Chicago, IL 60602
Phone: (312) 212-1520
cabraham@cair.com

Attorneys for Plaintiffs

21