**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NORTHWESTERN GRADUATE WORKERS FOR PALESTINE (GW4P), IFEAYIN EZIAMAKA OGBULI (INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED), AND MARWA TAHBOUB (INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED), | Case No.: 1:25-cv-12614 <br><br> Honorable Georgia N. Alexakis |
| Plaintiffs, | |
| v. | |
| NORTHWESTERN UNIVERSITY | |
| Defendant. | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION

Defendant, Northwestern University, by and through undersigned counsel, submits this Response in Opposition to Plaintiffs' Application for (1) Temporary Restraining Order and (2) Order to Show Cause Regarding Preliminary Injunction and states as follows:

## INTRODUCTION

A student organization at Northwestern known as Graduate Workers for Palestine ("GW4P"), Ifeayin Eziamaka Ogbuli ("Ogbuli"), and Marwa Tahboub ("Tahboub") (both of whom also purport to represent a putative class) (collectively, "Plaintiffs"), seek the extraordinary and unjustified remedy of a temporary restraining order ("TRO") against Northwestern University ("Northwestern") to prevent Northwestern from requiring them to take mandatory anti-discrimination training and attest that they will comply with Northwestern's anti-discrimination and code of conduct policies. They also request that this Court require Northwestern to implement

1

a number of other related measures. (*See,* Application for (1) Temporary Restraining Order and (2) Order to Show Case Regarding Preliminary Injunction, Dkt No. 7 ("TRO Petition"). In order to succeed, Plaintiffs must show both imminent harm and a likelihood of success on the merits of their underlying Class Action Complaint for Declaratory, Monetary, and Injunctive Relief (*See* Complaint, Dkt. No. 1) They fail on both counts. The balance of interests between the parties and the public, which is the final prong of the analysis, also fails to support their request for injunctive relief.

Plaintiffs claim that, absent such emergency relief, they face imminent and irreparable harm, including alleged loss of employment, interruption and destruction of ongoing research projects, loss of scholarships, loss of career opportunities, loss of research opportunities, loss of student visas, and potentially permanent exclusion from Northwestern. These allegations are speculative and some are overstated, but even if the claims constitute imminent harm, there is no question that the harm is entirely self-inflicted, which precludes entry of a TRO.[1] If Plaintiffs had simply registered for the Fall 2025 quarter on time, or if they had retained counsel and filed this lawsuit when they first realized they would be subject to the consequences of failing to take the training or sign the attestation, this "emergency" briefing and hearing would never have been necessary.

Furthermore, although Plaintiffs frame the issues in their underlying Complaint as unlawful discrimination, retaliation, and restrains on speech, that is simply not the case. In reality, the allegations center on Plaintiffs' personal opinions and beliefs about issues such as the definition of antisemitism and the events and conflicts that have consumed the Middle East for decades, even

---

[1] Northwestern acknowledges that loss of immigration status in particular, which occurs when a student does not maintain full time registration by certain deadlines, is a significant consequence. However, Northwestern reiterates the many opportunities students had to avoid that result, as described below.

centuries. Just a cursory review of the news and editorial pages makes it abundantly clear that there is no consensus on these issues. In other words, Plaintiffs' allegations of what constitutes discrimination are subject to debate. As a result, they cannot possibly claim that their position is "likely" to succeed. Importantly, Plaintiffs misapprehend how the training relates to Northwestern's implementation of its anti-discrimination policy. Even if Plaintiffs disagree with the context and background included in the training, ultimately, any complaint of discrimination or harassment is evaluated on a case-by-case basis allowing for the circumstances, including the perspectives of both reporting and responding parties, to be considered.

For these and the reasons stated below, Plaintiffs' TRO Petition should be denied.

## I.    FACTS

### A.  The Contested Training and Attestation, and Corresponding Deadlines

In 2024 and 2025, campuses across the country experienced protest movements related to the ongoing war in Gaza. Exhibit A. In part as a response to these movements, in early 2025, Northwestern took additional steps to ensure that its campus remained free of discrimination and harassment based on protected characteristics, including race, religion, national origin, and ethnicity. Among other things, on February 20, 2025, all Northwestern students were notified that they would be required to attend mandatory online training entitled *Building a Community of Respect and Breaking Down Bias* (the "training"). Affidavit of Jaci Casazza, attached as Exhibit B, at ¶ 8. The module is approximately 58 minutes long, with 17 minutes addressing anti-Semitism, 16 minutes addressing Islamophobia, and the remainder covering general expectations of respectful conduct and non-discrimination/harassment. *See, Northwestern student training "Building a community of respect and breaking down biases"*. At the conclusion, students are

required to attest regarding two separate policies (collectively, the "attestation"). Regarding the Policy on Discrimination, Harassment and Sexual Misconduct, the students must attest:

> *I acknowledge that I have reviewed and agree to abide by the University's policy on Discrimination, Harassment, and Sexual Misconduct.*

Regarding the Student Code of Conduct, the students must attest:

> *I acknowledge that I have reviewed and agree to abide by the Student Code of Conduct, which includes the University's policies on Demonstration and Display.*

Exhibit B, ¶ 8. Notably, the attestation does *not* require students to agree or endorse the substance or viewpoints expressed in the training. It merely confirms that they will comply with the University's uniformly applicable policies—just as all students must typically do to maintain good standing.

Plaintiffs take issue with the attestation because some Northwestern policies incorporate the International Holocaust Remembrance Alliance's ("IHRA") definition of anti-Semitism. (Complaint, p. 10-11). None of Northwestern's policies specifically reference the IHRA definition, but in applying its Policy on Discrimination, Harassment, and Sexual Misconduct ("Anti-Discrimination Policy"), Northwestern considers the U.S. Department of Education's guidance in complying with Title VI, Executive Order 13899 and the January 29, 2025 Additional Measures to Combat Anti-Semitism Executive Order.[2] All three essentially recommend the use of the IHRA definition. *See,* Exec. Order No. 13899, 84 F.R. 68779 (2019); Exec. Order No. 14188, 90 F.R. 8847 (2025); *See also* U.S. Dep't of Educ., Off. for Civ. Rts., Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964

---

[2] This incorporation appears in two places: (1) in FAQs to the Discrimination Policy, Frequently Asked Policy Questions: Office of Civil Rights & Title IX Compliance - Northwestern University, and (2) on a statement against antisemitism posted by the Office of the Provost Antisemitism: Office of the Provost - Northwestern University.

(PDF) (Jan. 19, 2021)).. In fact, many universities incorporate this Department of Education-sanctioned reference.

Students initially had until April 7, 2025 to complete the training, but the deadline was later extended to June 23, 2025. Exhibit B, ¶ 9. Students were also notified of the consequences that could take place if they failed to take the training or sign the attestation[3].

More specifically, failure to complete the training would result in a "registration hold." Exhibit B, ¶ 10. This means that students who did not timely take the training may not be permitted to register for the following quarter, which was the Fall 2025 quarter.[4] However, they would still be "affiliated" with Northwestern meaning their student status had not been terminated. Exhibit B, ¶ 13-15. Northwestern's standard policies provide that if a student does not register for classes for any reason (including due to a registration hold) by the fifth week of the eleven-week quarter, their student status is discontinued and they are no longer considered "affiliated" with the University. Exhibit B, ¶ 21. This is a standard procedure utilized by many universities to ensure their record of active students is accurate. Exhibit B, ¶ 23. Discontinued students can return to the University as early as the very next quarter if they successfully and timely complete an application for

---

[3] Northwestern acknowledges that the registration, hold, and discontinuation system can be confusing. To summarize the process and to frame this discussion for the Court, there are "registration windows" before each quarter starts during which students can register for classes. However, if students have a "hold" placed or their registration, they will not be able to register for classes, but they still maintain student status and do not lose most of the benefits associated with being a Northwestern student. If a "hold" is placed on their registration after they register for classes, they will not be able to make certain changes to their registration, for example adding or dropping a class. There is a "discontinuation" date by which holds must be cleared mid-way through each quarter. If students do not clear those holds, they lose student status, and a number of benefits that come with that designation. If a student registers for classes before a hold is placed, but fails to clear that hold before the discontinuation date, they will be able to finish out the quarter, but their registration hold will prevent them from registering for the following semester. In that case, if they still do not clear the hold, they will lose student status on the discontinuation date set for the following semester. Exhibit B, ¶ 13. To further assist the Court in understanding the processes at play here, Defendants offer Exhibit F, which is a chronology of event.

[4] Northwestern operates on a quarter system, with Winter, Spring, Summer, and Fall quarters. Summer quarter is not part of the standard school year. CITE.

readmission (which is not scrutinized in the same manner as an initial application for admission), and they take the necessary steps to release their hold. Exhibit B, ¶ 25.

Notably, failure to take the training or sign the attestation at issue are not the only reasons students are placed on registration holds. Students may have a registration hold for several reasons, such as outstanding tuition or fees, failure to acknowledge e-billing, missing required documentation, as a sanction resulting from a student conduct, academic integrity, or Title IX investigation, as the result of academic suspension or dismissal, or failure to comply with University requirements. Exhibit B, ¶ 19. Any of these issues in the prior quarter would result in a registration hold, and a student's failure to take steps to resolve the issues in time will, in the Fall 2025 quarter, result in discontinuation of student status as of October 20, 2025. Exhibit B, ¶ 24.

Registration for the Fall 2025 quarter opened on May 19, 2025 and closed on September 22, 2025. Exhibit B, ¶ 28. Because the deadline to take the training and sign the attestation was not until June 23rd, students – including Plaintiffs – could have registered for Fall 2025 *without* completing the training and attestation, and would therefore not be subject to a registration hold for Fall 2025 even if they failed to take the training and complete the attestation by the June 23rd deadline. Exhibit B, ¶29-31. In fact, both of the named Plaintiffs, Ogbuli and Tahboub, testified that they did in fact register for Fall 2025 before June 23rd. *See* TRO Petition at Exhibits 6, 8. Importantly, that does not mean that these students have evaded the training and attestation requirements. Rather, they just delayed them. Because they registered for Fall 2025 before the June 23rd training deadline, the registration hold that was placed on them will not result in discontinuation of student status on October 20th. Exhibit B, ¶ 29-31. However, if those students do not take the training or sign the attestation by Winter 2026 semester discontinuation deadline - February 2, 2026 –their student status will be discontinued, along with the consequences of that

action. Exhibit B, ¶ 31. In other words, students who did not delay registering for the Fall 2025 semester – including both named Plaintiffs – have not "emergency" on Monday October 20th. They would not be able to register for the Winter 2026 semester, but their student status would not be dropped until February 2, 2026.

On the other hand, the students who failed to register for classes before the June 23rd training date are facing more immediate consequences of their own making. Since they did not complete the training on time, and they waited to register for Fall 2025 classes, they never got the opportunity to register for the current semester. Exhibit B, ¶ 32-33. Those students are subject to the October 20, 2025 discontinuation deadline and their student status will be discontinued/their affiliation will be terminated on October 20th. *Id.* Because the consequences of failing to meet the October 20th deadline are significant, Northwestern sent *another* reminder of the training and attestation requirements to students on September 16, 2025. Although students should have understood that failure to clear *any* hold by October 20th would result in discontinuation of student status, as that is the standard longstanding policy for unresolved holds placed for any reason, the September 16th email reminded students of this significant consequence to provide them with ample time to comply.

### B. Student Objections Regarding Training and Attestation.

NUGW-UE Local 1122, the Union of graduate workers at Northwestern ("NUGW-UE,") expressed concerns to the University's Labor Management Collaboration Committee ("LMCC") about the training before the June 23rd hold deadline. Exhibit B, ¶ 34. After that deadline, on July 16, 2025, Micol Bez ("Bez"), who submitted an affidavit in support of Plaintiffs' TRO petition and is an elected official of NUGW-UE, sent an email to Provost Kathleen Hagerty ("Provost Hagerty") asking for a meeting with Northwestern administration to discuss student and graduate-

worker concerns about the content of the training and registration holds. *See* Bez Decl., Dkt. 7-1 ¶ 17; Exhibit G. Northwestern clearly did not alter or waive the training or attestation requirements as a result of this meeting. NUGW-UE formally grieved the issue at the end of July 2025 Exhibit B, ¶ 35. Although the grievance was not ultimately heard because the dispute was not within the purview of the collective bargaining agreement, before that determination was made, the University held off on engaging with graduate students pending the outcome. Exhibit B, ¶ 36. However, on August 8, 2025 a group of undergraduate students met with Provost Hagerty to discuss the same concerns. Exhibit H. In late August and again in mid-September, Provost Hagerty or her designee Leslie-Ann Brown Henderson met with an NUGW-UE representative to hear their concerns about the training and attestation. Exhibit B, ¶ 37. Following these discussions, on September 19, 2025, Micol Bez emailed Provost Hagerty and Susan M. Davis, Vice President for Student Affairs ("Davis") seeking clarification of the consequences of declining the training and attestation, and of the deadline for doing so to avoid those consequences. Exhibit B, ¶ 38.

Nearly one month later, on October 12, 2025, Plaintiffs' counsel's sent a demand letter to Northwestern's Office of General Counsel. Exhibit C. The Complaint was filed on October 15, 2025 and the TRO Petition was filed on October 16, 2025. Dkt. Nos. 1, 7.

## II.    LEGAL STANDARD

Plaintiffs correctly recite the general standard for injunctive relief: to obtain a temporary restraining order, a movant must show (1) some likelihood of success on the merits and (2) that it has no adequate remedy at law and will suffer irreparable harm absent relief. *Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021). If both elements are satisfied, courts then balance the interests of the parties and the public. *Id.* at 545. In this case, Plaintiffs fail on each of the three elements.

### III.     PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM AND AN ADEQUATE LEGAL REMEDY.

The "irreparable harm" standard requires that "irreparable injury is *likely* in the absence of an injunction." *See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008) (Emphasis in original.) The U.S. Supreme Court has held "[i]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22, citing *Mazurek* v. *Armstrong*, 520 U. S. 968, 972 (1997) (*per curiam*).

### A.  Most of the Relief Requested Fails to Allege an Irreparable Harm.

Plaintiffs ask this Court to issue an injunction to: (1) prohibit Northwestern from requiring students to complete the training or sign the related attestation; (2) compel Northwestern to remove registration holds placed on students who declined to complete the training; (3) enjoin Northwestern from applying or referencing the IHRA definition of antisemitism in its Student Code of Conduct; (4) allow students who already completed the training to "revoke" their acknowledgment of University policy; and (5) mandate that Northwestern issue a University-wide communication announcing the Court's order. *See* Dkt. 7 at 20. In evaluating these requests, it is critical to remember that the parties are before the Court on a TRO request, not on the underlying Complaint. Requests (1), (3), (4), and (5) do not, on their face, allege any imminent or irreparable harm that would be prevented by a TRO.

First, Plaintiffs' request to prohibit Northwestern from requiring students to complete the training or sign the related attestation applies to all students, not just Plaintiff. The deadline for students to complete the training and attestation has long past – it was June 23rd. In fact, more than 25,000 Northwestern students have already completed the training and attestation – a vast majority

without incident or complaint. CITE. As a result, the relief requested, which is essentially to not apply that deadline, does not present an imminent harm.

Second, Plaintiffs' request to enjoin Northwestern's reference to the IHRA definition of antisemitism likewise identifies no immediate or concrete injury. Most concretely, there is no allegation that anyone has been accused of discrimination or is under investigation, discipline, or threat of enforcement based on that definition. Therefore, none of the Plaintiffs face any imminent threat or harm due to the incorporation of that definition in Northwestern's policies. Further, the Plaintiffs *could not* face imminent harm for engaging in the types of activities they attest to wanting to participate in – broadly speaking, advocacy for Palestinian issues. Northwestern's policies are clear, discrimination and harassment are prohibited, period. Anti-Discrimination Policy, Exhibit D. Therefore, no discussion, debate, or disagreement about what is essentially a political or social issue can cross the line into harassment or discrimination. Moreover, it is impossible to say that the incorporation of the IHRA definition alone is per se discriminatory because any investigation of discrimination or harassment based on race, national origin, shared ancestry, or other protected characteristics must include consideration of the circumstances, including the perspectives of the parties involved.

Because none of the Plaintiffs have alleged that they have been prosecuted under the policies incorporating the IHRA definition, and because from a conceptual standpoint the IHRA definition cannot constitute an *imminent* threat, the threat of any harm as a result of Northwestern's incorporation of the IHRA definition of antisemitism is misplaced and entirely speculative. As a result, incorporation of the IHRA definition simply does not qualify as imminent harm sufficient to support a TRO because injunctive relief cannot rest on "possible future injury" or "hypothetical disputes." *See, Winter*, 555 U.S. 7, 22 ("Issuing a preliminary injunction based only on a possibility

of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy…"); *Endo USA, Inc. v. Baxter Healthcare Corp*., No. 25 C 2365, 2025 U.S. Dist. LEXIS 200736, at *32–33 (N.D. Ill. May 14, 2025) (denying preliminary injunction where alleged injury was "too tenuous and speculative" and holding that the irreparable-harm prong requires a likelihood of "substantial and immediate" injury, not mere possibility); *Jelena Liu v. Noem*, No. 1:25-cv-00716-JPH-TAB, 2025 U.S. Dist. LEXIS 73990, at *8 (S.D. Ind. Apr. 17, 2025) (finding no irreparable harm where plaintiffs alleged only a "potential gap" in education); *Doe v. Bd. of Trustees of the Univ. of Illinois*, No. 17-CV-2180, 2017 U.S. Dist. LEXIS 233640, at *5 (C.D. Ill. Dec. 18, 2017) (concluding that an academic interruption of up to two-and-a-half years was "too speculative to warrant the extraordinary and drastic remedy of an injunction").

Third, the request to allow students who already completed the training, presumably under duress, to "revoke" their acknowledgment of the policy also does not present imminent or irreparable harm because the alleged injury has already occurred. Nothing on October 20th – or at any future date – will change or compound whatever harm they claim they suffered when they took the training or signed the attestation. Courts routinely hold that past events, and completed or historical acts, cannot form the basis for emergency injunctive relief. *See Davis v. Barwick*, 2025 U.S. Dist. LEXIS 70839, at *3–4 (S.D. Ill. Apr. 14, 2025) (denying TRO where plaintiff's allegations concerned only past conduct and speculative future harm); An injunction relates to an ongoing constitutional violation, not to events that happened in the past. *See Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) ("When there is no continuing violation of federal law, injunctive [*3] relief is not part of a federal court's remedial powers."). *Long v. Brown*, 2015 U.S. Dist. LEXIS 89040, at *2 (S.D. Ind. July 9, 2015)("a preliminary injunction is intended to preserve the status quo").

Lastly, the request to mandate that Northwestern issue a University-wide communication announcing the Court's order likewise identifies no imminent harm. The absence of such an announcement does not threaten Plaintiffs with any loss of rights or status, and creating new communication obligations would serve no remedial purpose.

The only form of relief that even plausibly seeks to prevent future, imminent, non-hypothetical harm is the request to compel Northwestern to remove registration holds placed on students who declined to complete the training. However, that imminent harm is entirely of Plaintiffs' making, making it insufficient to support a TRO.

### B. Plaintiffs' Self-Inflicted Alleged Imminent Harm Is Insufficient to Justify a TRO.

The Court should deny Plaintiffs' TRO Petition for the sole reason that this alleged "emergency" is one of their own making. Courts have repeatedly held that a plaintiff who knowingly delays seeking relief cannot later claim that imminent, irreparable harm justifies a TRO.

For example, in *Notre Dame v. Sebelius*, Notre Dame sought a TRO to prevent enforcement of the Patient Protection and Affordable Care Act's contraceptive Services Requirement, claiming it violated the Religious Freedom Restoration Act. *University of Notre Dame v. Sebelius*, 988 F. Supp. 2d 912, 914 (N.D. Ind. 2013). The court denied the injunction because Notre Dame "wait[ed] until mere weeks before the wheels of the requirements were going to start to turn." *Id.* At 935. The court noted that had Notre Dame acted sooner, "the harm that they now fear could have been avoided altogether," and the school's delay "raise[d] questions regarding [its] claim of irreparable harm" *Id.* citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will suffer irreparable harm if a preliminary injunction is not entered."). *See also, Ixmation, Inc. v.*

12

*Switch Bulb Co.*, No. 14-cv-6993, 2014 U.S. Dist. LEXIS 150787, at *24–25 (N.D. Ill. Oct. 23, 2014) (unexcused delay "belies [movant's] contention of irreparable harm and defeats its motion for preliminary injunction. Delay is a factor in assessing the existence of irreparable harm, [citation omitted], and unexcused delay on the part of parties seeking extraordinary injunctive relief is grounds for denial of a motion 'because such delay implies a lack of urgency and irreparable harm.'" (citing *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). Notably, the *Ixmation* court specifically stated delay in pursing legal action is particularly relevant "where the party seeking injunctive relief has 'knowledge of the pending nature of the alleged irreparable harm.'" *Id.* at 24, citing *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, (D.D.C. June 18, 2014) (additional citations omitted). *See also, Checker Car Club of Am., Inc. v. Fay*, 262 F. Supp. 3d 621, 629–30 (N.D. Ill. 2017) (year-long delay rebutted presumption of irreparable harm; court inferred "no actual threat of irreparable harm" from inaction)*; Ripple v. Zurich Am. Ins. Co*., No. 17-CV-469-JPS, 2017 U.S. Dist. LEXIS 148223, at 19–20 (E.D. Wis. Sept. 13, 2017) (denying injunction where movant "knew about" the alleged harm months earlier; delay "militates against granting" extraordinary relief); *Shaffer v. Globe Prot., Inc*., 721 F.2d 1121, 1123 (7th Cir. 1983) (two-month delay in seeking injunction "inconsistent with a claim of irreparable injury"; plaintiff "has an adequate remedy at law and has not suffered an irreparable injury"); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("Self-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose.").

Here, Plaintiffs were put on notice that they would be subject to a registration hold if they did not complete the training and attestation many months ago.[5] Plaintiffs could have registered before the June 23rd deadline to take the training and sign the attestation. In fact, both named Plaintiffs did. For the named Plaintiffs and anyone else who registered before the June 23rd deadline, their student status will *not* be dropped on October 20th regardless of whether they take the training by that time. Instead, their student status will be dropped on the discontinuation date for next quarter, which is February 2, 2026 – making this much less of an emergency. Exhibit B, ¶ 28-31. On the other hand, those who waited to register for Fall 2025 are subject to the October 20th deadline because of that delay. Exhibit B, ¶ 32-33. That includes many of the witnesses who submitted affidavits in support of Plaintiff's TRO petition.

Furthermore, the Plaintiffs had multiple junctures over the course of the past many months to take legal action in a manner that would allow a less rushed consideration of these issues, but they simply did not do so. Specifically, NUGW-UE expressed their concerns about the training and attestation before the June 23rd deadline. Exhibit B, ¶ 34. The following day, on July 24th, Plaintiff Graduate Workers For Palestine sent a letter outlining their objections in detail. Notably, the first paragraph of that letter acknowledged their awareness of the potential consequences of failing to take the training and sign the attestation:

> *We also write with urgency concerning the registration holds that were placed on community members' Northwestern accounts, which result in wage freezes and place*

---

[5] Plaintiffs suggest the consequences of discontinuation are catastrophic in all cases. That is not the case. Some students will suffer relatively little as a result. For example, graduate assistantships will not be terminated until the end of the Fall 2025 quarter. Additionally, some of the harm Plaintiffs allege is speculative. For example, Plaintiffs allege they will lose years of lab work and research if they cannot access facilities. However, graduate students often work in teams. It is unclear if someone can manage the Plaintiffs' labs while this litigation pends – because that is the time frame in question, not indefinitely. Furthermore, if they elect to take the training and sign the attestation after October 20th, their hold will be released and relatively little will be lost.

*students and workers (especially international members) at immediate legal and financial peril.*

Exhibit I. This statement confirms that Plaintiffs understood those consequences months ago, but they still took no legal action. NUGW-UE filed a grievance, which was not heard because the issues were not within the NUGW-UE's purview. Exhibit B, ¶35-36. Even after the grievance was declined, Plaintiffs took no legal action. As stated above, undergraduate students met with the Provost on August 20th to express their concerns. Northwestern declined to lift the requirements after that meeting, yet Plaintiffs took no legal action. NUGW-UE met with the Provost twice in late August and mid-September. Exhibit B, ¶37. Despite not receiving the relief they sought, they still took no legal action. As stated above, the University sent a reminder about the training and attestation on September 19th – one month before the October 20th deadline, reminding them of consequences of failing to complete the requirements Still, the Plaintiffs took no legal action. On September 19th Micol Bez sent an email seeking clarification of the timing of consequences for not taking the training, which were then explained to her, but again, Plaintiffs again took no legal action. Exhibit B, ¶ 38. Instead, they waited until October 12th, eight calendar days before the deadline, to send Northwestern's Office of General Counsel a demand letter from their attorneys. They filed their Complaint on October 15th, five calendar days before the deadline, and the TRO Petition the next day, just four calendar days before the deadline. It is abundantly clear that Plaintiffs could have avoided this "emergency" and that the case law does not permit a plaintiff to force a TRO because they sat on their hands.

## IV.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

Even if Plaintiffs could establish an imminent, irrevocable harm – which they cannot – they would still need to establish a likelihood of success on the merits of their underlying Complaint. Their Complaint centers on concepts that have been debated for centuries. Decades of politicians have sought to broker a compromise on what is often referred to as "the middle east problem." This is not a question of discrimination against Plaintiffs, or against Palestinians, Arabs, or Muslims. It is a question seeking answers to complex issues of peace in the Middle East, the definition of antisemitism and by extension Islamophobia, Israeli and Palestinian statehood, and the like. The fact that this is an ongoing global issue makes it clear that no one side has a "likelihood of success." As such, neither do Plaintiffs in the merits of their Complaint.

### A. Plaintiffs are not Likely to Establish the Elements of their Section 1981 Discrimination Claim.

To prove discrimination under 42 U.S.C. § 1981, Plaintiffs must show that they are a member of a protected class (race), that they were prevented from making or enforcing a contract, and their race was a "but for" cause of their injury. *Comcast Corp. v. National Assn. of African American-Owned Media*, 591 U.S. 1 (2020). They must also establish discriminatory intent. *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 378 (1982). Here, one of the named Plaintiffs and multiple of the affiants who claim to be members of the GW4P group admit that they are *not* Palestinian or Arab. CITE. As such, at least some of the Plaintiffs and putative class members[6] will fail to establish a § 1981 claim.

---

[6] In addition to the substantive claims, there is significant doubt that Plaintiffs will be able to establish commonality or typicality to support a class action. There is clearly not commonality of racial, ethnic, or religious identity, not every member of the class signed the protest letter that they claim is a form of retaliation, not all are employees so would not be subject to the Illinois Freedom of Speech in the Workplace law, some of the putative class members took the training and signed the affidavit, only one of the named Plaintiffs and some of the putative class members are subject to the October 20th deadline, not all putative class members are graduate student workers, and in any case, graduate student workers are not necessarily employees under the Illinois law so in that respect, this was not an employee training. The graduate students are required to take the training because they are students, not because they are employees

Furthermore, given that individuals of multiple races – including by Plaintiffs' admission, Jewish students – were subject to the same deadlines and consequences for failing to take the training or sign the attestation, it is difficult to see how Plaintiffs' race could be the "but for" cause of their alleged injury. Complaint, p. 24-25. Plaintiffs similarly do not come close to establishing that Northwestern implemented the required training, or required students to sign the attestation that incorporates the IHRA definition of antisemitism, because they *intended* to discriminate against Palestinians, Arabs, or Muslims.

When Northwestern announced the training requirement, it explained that the purpose was to introduce students to the University's Guiding Principles, educate them on what drives discrimination affecting all groups, and inform them of the University's strong anti-discrimination policies and available reporting options for discrimination and harassment. Exhibit E. These objectives are the *antithesis* of discriminatory intent – the training itself is designed to encourage dialogue, understanding, and cooperation across differing viewpoints. Notably, of the 58-minute module, approximately 17 minutes address antisemitism, 16 minutes address Islamophobia, and the remainder cover general expectations of respect, inclusion, and campus conduct. Any objective observer would recognize that the intent of the training is to prevent discrimination and harassment, not to promote it. Plaintiffs may disagree with certain content of the training, but disagreement is certainly "likely" to be evidence of unlawful or discriminatory motive.

Additionally, Plaintiffs' contention that the seriousness of the consequences for non-compliance with the training and attestation requirements somehow demonstrates discriminatory motive is both speculative and unsupported. First, as described in detail above, any student who has a registration hold for any reason, and who does not clear that hold before the discontinuation

deadline, will have their student status dropped. This universal policy is applied in myriad circumstances.

Plaintiffs also argue that the fact that the same policy and consequences do not apply to compliance with the sexual misconduct training is evidence of discriminatory intent. They similarly argue that the fact that faculty do not take the same module for antisemitism training is evidence of discriminatory intent. TRO Petition, p. 25. They are mistaken. Especially as a private institution, Northwestern has the right and responsibility to set policies, both procedural and substantive, and enforce those policies. Given the unrest across campuses nation-wide in 2024 and early 2025, Northwestern made the decision that this antidiscrimination training was important enough to subject it to the registration hold/discontinuation policies for students. It also made the determination that students should take a different type of training, because students have different experiences, levels of education, and understanding of issues, and they were closer to the protest movements on campus. Notably, however, both students and faculty are subject to the Anti-Discrimination Policy that incorporates the IHRA definition of antisemitism. These decisions are entirely within Northwestern's purview, and are entirely reasonable. They are certainly not "likely" to be discriminatory. The thought and nuance Northwestern placed in designing these policies in fact demonstrates a *commitment* to anti-discrimination, not discriminatory intent. Furthermore, Plaintiffs are mistaken that the sexual misconduct policy does not carry the same penalties. First year and new students *are* subject to registration holds and discontinuation if they do not complete sexual misconduct training, reflecting the seriousness of that training.

With respect to the attestation, Northwestern's reference to the IHRA definition of antisemitism in its application of the Anti-Discrimination Policy is entirely consistent with federal guidance, and with other universities' policies. The U.S. Department of Education's Office for

Civil Rights has expressly cited the IHRA definition when investigating Title VI compliance. CITE. No court has held that adopting or referencing the IHRA definition constitutes discrimination; to the contrary, federal regulators have made clear that it does not. *See* U.S. Dep't of Educ., Office for Civil Rights, Fact Sheet: Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics (2023) (acknowledging the IHRA definition as a useful interpretive tool under Title VI). Because Northwestern's conduct is on its face consistent with federal policy, and applied uniformly to all students, Plaintiffs cannot plausibly demonstrate a substantial likelihood of success on the intent element of their §1981 claim.

### B. Plaintiffs are not Likely to Establish the Elements of their Title VI Discrimination Claim.

Plaintiffs devote several pages of their Complaint and TRO Petition to broader human-rights issues in the Middle East. These are topics that, however important, have no bearing on whether Northwestern's policies are discriminatory under federal or state law. The relevant question here is whether the training or the reference to the IHRA definition in policy treats students differently on the basis of race or religion, which is what Title VI prohibits. It does not.

Since its introduction in February 2025, more than 25,000 Northwestern students have completed the training, most of whom did so without complaint or objection regarding its content. CITE. That alone indicates that it is far from clear that Plaintiffs are "likely" to succeed in establishing the training and attestation as discriminatory; clearly reasonable people have already disagreed. Furthermore, like many universities recently, Northwestern has faced public criticism from *both* sides of this issue—some claiming it has not done enough to protect Jewish and Israeli students, and others, such as with this lawsuit, asserting it has not adequately supported Palestinian and Muslim students. This widespread disagreement underscores that these issues are deeply

contested and subjective, not evidence of discriminatory intent or effect. It is therefore difficult to see how Plaintiffs can establish a "likelihood of success" on their claims when public discourse and campus experience alike reveal such widespread disagreement.

### C. Plaintiffs Cannot Show Retaliation or Any Causal Connection Between Protected Activity and Adverse Action.

Plaintiffs' retaliation theory fares no better. To prevail on their Title VI or Section 1981 retaliation claims, a plaintiff must show (1) that they engaged in protected activity; (2) that they suffered a materially adverse action; and (3) that a causal connection exists between the two. [CITE]. Plaintiff simply cannot establish a causal connection.

As stated above, the placement of registration holds or temporary loss of student status were triggered by Plaintiffs' own failure to complete the training, not any protected activity they engaged in. Those same consequences would have been imposed on any student who ignored the requirement for whatever reason. CITE. Plaintiffs' theory that Northwestern imposed the holds because of their beliefs or advocacy is pure speculation. Nothing in the record suggests that the University acted with retaliatory motive or singled out these students based on their opposition to the training. Students will miss academic and administrative deadlines for countless reasons: travel, scheduling, or oversight. CITE. In fact, Northwestern's Registrar, Jaci Casazza, explained in a September 19, 2025 email to Bez, "[i]n a typical term, many students simply forget to register, and these reminders spur them to do so by making the potentially serious impacts clear." Regardless of the reason for non-completion, the same consequences apply uniformly.

Plaintiffs also claim the difference between the consequences for failing to take sexual misconduct training and the content of the faculty training is also evidence of retaliation. However, as explained above, there are reasonable explanations for those differences, and that reasonable

explanation precludes the conclusion that Plaintiffs are "likely" to establish a retaliatory motive based on the differences in training modules and consequences.

### D. Plaintiffs Cannot Establish a Claim Under the Illinois Freedom of Speech in the Workplace Act.

Plaintiffs admit that the Illinois Freedom of Speech in the Workplace Act does not apply to training intended to foster a civil and collaborative workplace or reduce or prevent workplace discrimination/harassment. TRO Petition, p. 13. As explained above, that is *exactly* what the training in question was intended to do. This is not a political issue or a religious issue. It is a civility issue and a legal compliance issue. Northwestern sought to prevent the type of upheaval and unrest seen on other campuses nationwide, and also sought to ensure a campus free of discrimination and harassment, by offering targeted education to students and faculty about bias and discrimination. There is certainly no "likelihood" that  the training, or the attestation, coerced anyone as to religious or political views.

### V. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVORS NORTHWESTERN.

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. NRDC, Inc*., 555 U.S. 7, 24 (2008). The Supreme Court has held that in each case courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.")

At its core, Plaintiffs' TRO Petition asks this Court to invoke the extraordinary remedy of a temporary restraining order to override a private university's academic and administrative

judgment because a very small subset of students disagrees with a required training and attestation. That is not the role of the courts. TROs are not vehicles for enforcing the personal beliefs or opinions of individual students, or for dictating how a private educational institution governs itself. This is especially the case when at present, this TRO is brought by approximately 15 students, versus the over 25,000 students who took the training without issue. Ultimately, Northwestern is a private institution, not a state actor bound by the First Amendment. It bears an independent legal obligation to ensure compliance with federal and state anti-discrimination laws, however, and it also retains the discretion as to how to meet that obligation. This includes adopting a federally recognized definition of antisemitism. Nothing in federal or state law forbids this practice. To the contrary, it has been encouraged and it has been adopted by multiple other institutions. Northwestern's policies are neutral and uniformly applied. Significantly, fundamentally, discrimination or harassment against *any* student based on protected category – including Jewish, Israeli, Muslim, Palestinian, Arab, or otherwise – is strictly prohibited by Northwestern policies. *See, policy-on-discrimination-harassment-and-sexual-misconduct-2025-2026.pdf.*

## CONCLUSION

The issue before this Court is not whether Plaintiffs have stated a cognizable claim. That is for a motion to dismiss. The issue here is whether they are *likely to win.* The answer is certainly no. There are doubts about Plaintiffs' ability to satisfy the elements of each of their claims. There are also doubts about whether the training or the IHRA definition of antisemitism is discriminatory. Debates swirl about those very topics in the news every day. The underlying claims on their face bely any effort at predicting what a jury will say is or is not discriminatory. Plaintiffs may disagree with Northwestern. They may even believe Northwestern's policies are discriminatory or retaliatory, and although Northwestern strongly disagrees, Plaintiffs have the right to litigate those

beliefs. But given all of the above, they do not have the right to emergency injunctive relief on those issues. Finally, rewarding Plaintiffs for sitting on any potential rights they contend they have defeats the purpose of the extraordinary relief of a TRO.

WHEREFORE, for all the reasons stated herein, Defendant requests that the Court deny Plaintiffs' Application for (1) Temporary Restraining Order and 2) Order to Show Cause Regarding Preliminary Injunction, and grant such additional relief as the Court deems proper.

Dated: October 18, 2025          Respectfully submitted,

**NORTHWESTERN UNIVERSITY**

By:     */s/ Monica H. Khetarpal*
         One of its Attorneys

Monica H. Khetarpal
Jacqueline M. Brown
Jackson Lewis P.C.
150 North Michigan Ave., Suite 2500
Chicago, IL 60601
Tel.: 312.787.4949
Monica.Khetarpal@jacksonlewis.com
Jacquline.Brown@jacksonlewis.com
Firm ID #39408

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on October 18, 2025, she caused a true and correct copy of the foregoing ***Defendant's Response In Opposition To Plaintiffs' Application For (1) Temporary Restraining Order And (2) Order To Show Cause Regarding Preliminary Injunction*** to be filed with the Court by electronic filing protocols, and that same will therefore be electronically served upon all attorneys of record registered with the Court's ECF/CM system.

*/s/ Monica H. Khetarpal*