IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

| | |
|---|---|
| Northwestern Graduate Workers for Palestine (GW4P) et al., | Case No. 1:25-cv-12614 |
| Plaintiffs, | Judge: Georgia N. Alexakis |
| v. | Magistrate Judge: Keri L. Holleb Hotaling |
| Northwestern University, | |
| Defendant. | |

---

# REPLY IN SUPPORT OF PLAINTIFFS' APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION

The Plaintiffs offer the following reply in support of their application for a temporary restraining order and an order to show cause regarding why a preliminary injunction should not issue:

## I. This Court has no obligation to defer to policies that do not exist except as applied to Plaintiffs and which discriminate on their face.

During the October 17, 2025 status hearing, this Court expressed caution about interfering with the affairs of a university. Northwestern's response brief makes clear that interference is not only permissible but necessary to the protection of the statutory rights of workers and the civil rights of Northwestern University's ("Northwestern," "Defendant," or "the University") students.

There is no academic exemption to our civil rights laws. The Seventh Circuit disclaimed the idea that there are "separate and more lenient standards" for universities in discrimination cases. *Royan v. Chicago State Univ.*, 145 F.4th 681, 690 (7th Cir. 2025) (discrimination case); *Mawakana v. Bd. of Trustees of Univ. of the D.C.*, 926 F.3d 859, 866 (D.C. Cir. 2019); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 209 (2023) ("[A] university's freedom was not

1

unlimited. Racial and ethnic distinctions of any sort are inherently suspect . . . .") (internal citations omitted).

Rather, courts seek to respect the academic freedom of universities in that they do not second-guess the *subjective academic judgments* of academic institutions, particularly where they concern the professional standards and academic requirements of an educational program. *Id.* at 689; *Novak v. Bd. of Trs. of S. Illinois Univ.*, 777 F.3d 966, 976 (7th Cir. 2015); *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012).

It turns out that the policies and regulations Northwestern asks the Court to deem inviolate, and in fact so inviolate that it could not agree to a standstill for a few days to allow the Court more time to consider this petition, *do not exist*. Northwestern has identified no regulation, policy or practice indicating that students who do not take their discrimination trainings are placed on a registration hold and then excluded from the University. Rather, Northwestern admits that these extraordinarily punitive measures stem from a special rule it developed "[i]n part as a response to" "protest movements related to the ongoing war in Gaza." Dkt. 14 at p. 3; *see also Id.* at p. 18 (explaining that the student antisemitism was different than the faculty training because students "were closer to the protest movements on campus.").

And indeed, the administration indicated in an email to the president of Northwestern's chapter of the American Association of University Professors in February of 2025 after the training course was instituted that the punishment was not automatic or inevitable. She wrote, "Student Affairs has not yet determined whether a registration hold would be used for non-compliance." Ex. 1 (Stevens Decl.) at Ex. A. Northwestern's decision to impose the most severe possible punishment on students who refused to be complicit in the silencing of Palestinian solidarity advocacy was an affirmative choice, not a neutral and preexisting University policy.

## II. Plaintiffs are likely to succeed in proving violation of the Worker Freedom of Speech Act

Plaintiffs' Worker Freedom of Speech Act claims are very straightforward and Plaintiffs are likely to succeed on their claims under this act. Defendant conditions student workers' continued employment (which depends on current student status) on completing the training program, including the antisemitism module. As the training is required by Defendant and is in line with the definition of antisemitism to which it requires students to attest, Defendant does not dispute the content of the training is its own opinion. Doc. #14, p. 21. Defendant also does not dispute with any substantive argument that the Plaintiffs and similarly-situated student employees are covered by the Act. *Id.*

Defendant's only argument is that the training is legitimately intended to foster a civil and collaborative workplace or reduce or prevent workplace discrimination and harassment, which is an exception to the prohibitions of the Freedom of Speech Act. *Id.* Defendant does not engage with the content of the training because doing so would expose how religious and/or political it is. For example, the training does not simply state widely-accepted historical facts in an attempt to educate students, it offers what Defendants admit are disputed opinions imputing a single viewpoint about how a globally diverse population of Jews practice their religion and the political issues related thereto. The religious and political opinions about which Defendant mandates Plaintiffs and all other students view and listen include, among other things:

(1) what being Jewish means to "most" Jews;

(2) that the boundaries of the state of Israel include parts of what is currently recognized as Syria;[1]

---

[1] The members of the United Nations Security Council (which includes the United States) voted unanimously through Resolution 497 that "the Israeli decision to impose its laws, jurisdiction and administration in the occupied Syrian Golan Heights is null and void and without international legal effect." U.N. Doc. S/RES/497 (1981), *available at* https://docs.un.org/en/S/RES/497(1981). By Northwestern's standard, the

3

(3) that Judaism is "centered around . . . the land of Israel";

(4) that "most forms" of antizionism are antisemitic (even if expressed by Jews);

(5) that antisemitism is about "hating our institutions," i.e. that the Palestinian-led boycott, divestment, and sanctions movement is antisemitic;

(6) that claiming Jews (and in this context Israel) are ever responsible for oppression is antisemitic (i.e. saying that Israel oppresses Palestinians is antisemitic);

(7) that opposing any form of Jewish "self-determination" is antisemitic even if it such "self-determination" is to the detriment of Arabs, Palestinians, Muslims, Christians, antizionist Jews, or other religious groups or nationalities; and

(8) that "for most Jewish people, they feel the same because they are the same."

Dkt. 7-4 at ¶ 4. All of the above are plainly religious and/or political statements; opinions of the Defendant employer mandating their viewing. And none of the above nor other aspects of the antisemitism training can be explained as content intended to foster a civil and collaborative workspace; Northwestern says it imposed the training course because of the encampment but makes no connection between the encampment and its Title VI obligations. Dkt. 14 at pp. 3-4. It does not explain why students must accept a "Jewish right of self-determination" in Syria and "create an environment in which . . . Zionism [is] welcome" in order for Northwestern's campus to be free from antisemitism.

In fact, there were reasons other than Title VI for the University's adoption of IHRA and the training course. In the context of local protests about Israeli genocide, former University President Schill stated that he personally felt that JUF video was the viewpoint of most Jews, if not all Jews, so people should hear that viewpoint, even though students and faculty were telling him it was a

---

United States was thereby engaging in antisemitism by denying the Jewish right of self-determination in that territory..

discriminatory viewpoint. Ex. 6 (Winegar Dec.), para. 9. A "viewpoint" that omits alternative viewpoints is inherently political opinion and having such a personal motivation for imposing religious and political opinions on 25,000 students undercuts Northwestern's argument that it was a bona fide effort to address discrimination or foster collaboration. University President Bienen also stated in October 16, 2025 remarks to the Faculty Assembly that these online trainings do not actually educate anyone. Dkt. 7-7 at 5. Defendant does not impose any comparable restrictions on interpretations of ethnic or religious history on groups other than Palestinians and/or Arabs and antizionist Jews, which also undercuts any argument by Defendant that the training does not constitute political or religious opinion as opposed to something educational. *See infra.*

### III. Plaintiffs are likely to succeed in proving discrimination.

A. Political expressions related to cultural expressions are not exempted from Title VI and Section 1981 protection.

Applicable case law and regulations demonstrate that the protections of national origin expressions and the prohibition of associational discrimination implicate the same rights. Defendant does not respond to Plaintiff's contention that Defendant's treatment of non-Arab members of GW4P and class members constitute associational discrimination. Instead, Northwestern argues that because one named plaintiff and three of the GW4P members who submitted declarations "admit" they are not Arab, Northwestern could not have been discriminating against them. Dkt. 14 at p. 16.

The civil rights employment statutes on which Plaintiffs rely are not intended merely to protect superficial traits; their protections are to be construed broadly so as to eliminate the harmful effects of racial/ethnic animus. *See e.g. Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 889 (7th Cir. 1996). In service of this principle, they protect against associational discrimination. See *Hively v. Ivy Tech Cmty. Coll., S. Bend*, 830 F.3d 698, 715–16 (7th Cir. 2016) ("A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for

5

the discrimination is a prejudice against the biracial child.")[2] (quoting *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999)). This protection of associations is "not limited to close or substantial relationships." *Kengerski v. Harper*, 6 F.4th 531, 539 (3d Cir. 2021) (Title VII protects against adverse action imposed "because an employer disapproves of interracial association").

Title VI and Section 1981 protect against discrimination against individuals who are targeted because of their association with members of a national origin group. As Plaintiffs contended in their petition, the definition of national origin encompasses "membership in, or <u>association with</u> an organization identified with or seeking to promote the interests of national origin groups." 29 CFR § 1606.1 (emphasis added). The Seventh Circuit has adopted the EEOC's broad definition of national origin discrimination as reflected in 29 CFR § 1606.1. See *Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007).

Grad Workers for Palestine is exactly such an organization. It promotes the interests of national origin groups– Palestinians or Arabs– and its members testify that they do so in association with Palestinians and Arabs. See e.g. Dkt. 7-1 ¶ 13; Dkt. 7-3 ¶ 18; Dkt. 7-5 ¶ 15. Likewise, named Plaintiff Ogbuli testifies that she has "associated with Palestinian and other Arab students on campus and wish to continue supporting them in their struggle for recognition of their humanity and national liberation in their homeland." Dkt. 7-6 at ¶ 13.

It is precisely the association between Arab students and their antizionist Jewish colleagues and other supporters that the University has targeted. Its hostility to Palestine solidarity speech, expressed by large groups of people on campus, is evident in its actions. In the attached email from Evanston Mayor Daniel Biss, Biss describes a conversation with Northwestern administrators in

---

[2] The Seventh Circuit recognized in a subsequent opinion in *Hively* that associational discrimination prompted by *national origin* is equally protected. *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 349 (7th Cir. 2017).

6

which he expressed reluctance to deploy police, saying that "mass arrests of peaceful protesters . . . is nothing we should participate in," but President Schill and Luke Figora told him in "pointed" language that they wanted to make mass arrests and clear the peaceful encampment. Ex. 1 at ¶¶ 4-5, Ex. C.

    B. Policies that apply to everyone but are discriminatory on their face violate Title VI and the Civil Rights Act of 1866.

Northwestern argues that because the training applies to everyone, it cannot be discriminatory. Dkt. 14 at p. 19. But the training itself is plainly discriminatory against Arabs and anti-Zionist Jews. Northwestern does not identify any other instance in which it prohibits a group from advocating for its human rights or ethnic/religious identity on the basis that it might offend the sensibilities of another group. For example, the anti-Palestinian bias video in the same training makes no such demands. Dkt. 7-2 (Cohen Decl.) at ¶ 4 (starting at 41:00). No one on Northwestern's campus is compelled to accept the Palestinian right of self-determination, nor is anyone prohibited from expressing nationalist goals which contradict Palestinian ones. *Id.*

In fact, Northwestern's imposition of the IHRA definition discriminates against the very group it claims to be protecting. As Jewish doctoral candidate Anna Dumont explains,

> The political status of Israel as a Jewish state has been the subject of considerable debate *within* the global Jewish diaspora for as long as there has been political ZIonism. I have many beloved friends and family members [] who believe deeply in the importance of Israel as a Jewish state. We are both equally Jewish . . . . Yet the IHRA definition of anti-Semitism, and the JUF video I am being asked to watch and acknowledge, erases this history, and goes even farther, equating non- and anti-Zionist positions with the Nazism of David Duke. I reject this false equivalence. And I think you will agree that it is hardly the place of a university dedicated to free inquiry to dictate to me the ethical imperatives of my own faith as I understand them.

Ex. 5 (Dumont Decl.) at Ex. A. Plaintiffs have a right to critically discuss and protest Zionism in association with students like Ms. Dumont.

    C. Northwestern's claim that it is merely following federal guidance is pretextual.

7

Northwestern claims the purpose of the training course is "legal compliance." Dkt. 14 at p. 21. But the guidance it cites – the President's executive orders and question/answer pages on the website of the Department of Education – do not override Title VI and Section 1981. See *AFGE v. Trump*, 318 F. Supp. 3d 370, 393 (D.D.C. 2018) ("[T]he President . . . acts in excess of his statutory authority if the orders that he issues conflict with a federal statute."), rev'd on other grounds, 929 F.3d 748, 442 U.S. App. D.C. 232 (D.C. Cir. 2019). And these statutes could not be expanded to ban speech that is constitutionally protected. *Kilborn v. Amiridis*, 131 F.4th 550, 561 (7th Cir. 2025). This is likely why both the Executive Order and the OCR's Question/Answer page describe IHRA as "the non legally binding working definition of anti-Semitism."[3] Defendant's claim that "many universities incorporate" the IHRA definition is unsupported by any fact in the record. Dt. 14 at p. 5. Similarly lacking in evidentiary support is the University's claim that "a very small subset of students disagrees with a required training and attestation." Dkt. 14 at p. 22. The number of signatories on students' open letter to the administration, and the fact that 338 faculty members passed a resolution in defense of the rights of students, suggest the contrary. Dkt. 7-5 at Ex. F; Dkt. 7-7 at Ex. A.

The University's claim that the purpose of the training course is legal compliance is pretextual. In an email to Plaintiff Ogbuli's advisor, who asked whether there would be an option for students to conscientiously object, a Student Affairs administrator responded that the Attestations were mandatory, explaining that although students need not agree with the training modules, the speaker in the JUF video "does represent how many in the Jewish community feel when targeted with

---

[3] United States Department of Education Office for Civil Rights, *Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964*, available at https://www.ed.gov/media/document/questions-and-answers-executive-order-13899-combating-anti-semitism-and-ocrs-enforcement-of-title-vi-of-civil-rights-act-of-1964-2019-21235.pdf; Executive Order on Combating Anti-Semitism, Executive Order 13899, December 11, 2019, available at https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-combating-anti-semitism/

certain actions and words, and it is Northwestern's belief that our students have an understanding of that perspective even if they disagree with it." Ex. 3 (Tilley Decl.) at Ex. A.

The University's claim that students need not agree with the video rings hollow when Northwestern admits that the video is in fact a "discrimination training." Dkt. 14 at p. 1. The video is quite explicitly purporting to teach students what is and is not antisemitism. It instructs, "Antizionism also takes many forms, most of which are antisemitic . . . . It's important to create an environment in which Judaism, including Zionism, are welcome." Dkt. 7-2 at ¶ 4. Title VI does not obligate Arabs to "welcome" Zionism. As the University admits, "these issues are deeply contested." Dkt. 14 at ¶¶ 19-20. This demand precludes Arabs from advocating for their own self-determination in Palestine and Syria and a state in which rights and privileges are not dependent on ethnic or religious affiliation, and precludes Jews on campus from rejecting Zionism.

Moreover, Northwestern's claim that certain types of advocacy for Palestinian rights makes most Jewish people "feel targeted" overlooks that Title VI does not apply a purely subjective standard. The law requires both a subjective and objective showing that the conduct was so severe or pervasive that a reasonable person would find it discriminatory or harassing. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). And mere offense at political expression cannot satisfy Title VI, as protected political speech "cannot give rise to a harassment claim." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) (" if speech is not harassment, listeners who are offended by the ideas being discussed certainly are not entitled to shut down an entire forum simply because they object to what some people are saying.").

Some white Americans felt targeted when black Americans demanded civil rights and freedom from segregation. That did not justify silencing their advocacy for the basic rights and dignity of their communities. *National Association For Advancement of Colored People v. Claiborne Hardware Company*,

458 U.S. 886, 910 (1982) ("Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action.")

## IV. Plaintiffs will be irreparably harmed absent the relief requested.

A. Defendants misstate the case law governing the analysis of "delay" with respect to Preliminary Injunctions.

1. <u>The timing of this Lawsuit and Application for Temporary Restraining Order is not unreasonable.</u>

Plaintiffs cannot be said to have precluded from injunctive relief for first trying to negotiate their way out of this unlawful training requirement and attestation before resorting to the filing of a lawsuit. *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 451-452 (7th Cir) (rejecting assertion that an eighteen month delay was inconsistent with irreparable injury where there was evidence plaintiffs worked on multiple fronts to remedy the issue before resorting to filing a suit). Defendants' own recitation of the facts makes clear that there were ongoing communications with Northwestern in which the Plaintiffs and their supporters made continued attempts on multiple fronts to resolve this matter, including through a formal grievance process. Dkt. 14 pg. 15. Micol Bez testifies that as recently as September 17, Provost Hagerty committed to students that she "would try to pursue one of the alternative avenues for resolution we proposed, and that she would let us know by September 23, 2025." Ex. 4 at ¶ 20. Provost Hagerty never responded, despite a reminder on September 25. *Id.* at ¶ 24. Plaintiffs filed the instant lawsuit and petition within less than a month of those communications. Dkts. 1, 7.

Defendants' contention that Plaintiffs "sat on their hands" before filing this lawsuit and seeking injunctive relief is wildly and demonstrably inaccurate. To the contrary, Plaintiffs have provided ample evidence demonstrating ongoing attempts to resolve this matter short of litigation, including multiple meetings between the administration and students, meetings between the administration

and the graduate students union, multiple meetings between the administration and faculty, a faculty assembly resolution, and multiple written communications and an open letter. Ex. 4 (Supp. Bez Declaration); Ex. 6 (Winegar Declaration); Doc. 7-3, ¶¶ 4, 15-17 (Jaliff Declaration); Ex. 3 (Tilley Decl.) ¶ 7; Doc. 7-5, ¶ 14 (Melles Declaration); Doc. 7-8, ¶ 7 (Tahboub Declaration); Doc. 7-3, ¶¶ 14-15; Doc. 7-4, ¶ 5-7; Doc. 7-7 (Peshkin Declaration, Exh. B); Ex. 1 (Stevens Decl.) at ¶ 2.

Furthermore, Defendant engaged in conduct that delayed any clarity about the possibility of a resolution pre-litigation. As an example, On July 16, 2025 Micol Bez emailed the University Provost requesting a meeting to discuss student and graduate workers' concerns about the training and the related holds on registration. Ex. 4 (Bez Supp. Dec.) ¶¶ 3- 7. The Provost's office requested a letter outlining the concerns and seemingly agreed to a meeting, stating that dates for a meeting would be provided. *Id.* Weeks later, after serving an open letter signed by 40 concerned students detailing arguments about the discriminatory training, the Provost still failed to provide and continued to postpone the promised meeting date. *Id.* at ¶¶ 8-9. On July 26, 2025, NUGW filed a grievance regarding the holds on registrations related to the trainings. *Id.* at ¶ 10. The Provost then took the position that it could not meet with students pending the grievance and would only meet after the union grievance was concluded, despite reminders that the meeting was on behalf of all affected and concerned students, not just union members. *Id.* at ¶ 11-13. In August the University dismissed the grievance. *Id.* at ¶¶ 14-15. Students renewed their requests for a meeting and were finally able to do so on August 20, 2025. *Id.* at ¶ 16. At that meeting the students were told the University would find precise answers about the students' questions regarding the consequences of not participating in the trainings and that they would consider the options that the students' had provided, including an option for conscientious objection, allowing students to take the faculty training instead, or allowing students to affirm they took the training but did not agree to its contents. *Id.* at ¶ 16. The Plaintiffs continued to communicate their wish to reach an amicable resolution and again, on September 17,

11

2025, the Provost indicated there was a possibility it could pursue one of the alternative avenues the students proposed by September 23, 2025. Id. at ¶¶ 19-20. Despite repeated requests to comply with that timeline, the Provost ceased responding to Plaintiff's communications, including Ms. Bez final attempt on October 13, 2025. *Id.* at ¶¶ 20-25.

Any purported delay alleged by Defendant is not without explanation, namely that the Plaintiffs reasonably engaged in due diligence with respect to investigating the potential harms, took action to combat the harm on various fronts, and engaged in ongoing attempts to resolve this matter pre-litigation. If anything, the timing of this lawsuit is a direct result of Defendant's own lack of clarity and misleading responses and communications regarding its own policies. Therefore, it cannot be used to undermine Plaintiffs' legitimate claims of irreparable harm. *Peng v. Partnerships & Unincorporated Associations Identified on Schedule A*, No. 21-CV-1344, 2021 WL 4169564, at *3 (N.D. Ill. Sept. 14, 2021) (Dow, J.).

Finally, the inherent risk that the Plaintiffs are taking by bringing a lawsuit against the University, that ultimately controls the trajectory of their future studies and careers, should not be discounted nor disregarded. Northwestern has in fact taken drastic punitive action in response to Palestine solidarity speech, as exemplified by its having deployed police against a peaceful encampment; filed criminal charges against faculty and staff; summarily suspended from teaching, and terminated the employment of its Daniel H. Renberg Chair of social justice in reporting after he gave a speech at the Gaza encampment and stood in solidarity with students. Ex. 2, Thrasher Declaration; Ex. 1 at Ex. A.

> 2. <u>A purported delay in filing is not a proper basis for denial of a preliminary injunction in this matter and does not preclude a finding of irreparable harm</u>.

Though delay in seeking a remedy may be a factor bearing on the need for a preliminary injunction it does not necessarily preclude a finding of irreparable harm and is not, on its own,

12

dispositive. *Int'l Star Registry of Ill., Ltd. v. RGIFTS Ltd.*, No. 21 CV 6446, 2024 U.S. Dist. LEXIS 122842, *11-13 (N.D. Ill. 2024); *Promatek*, 300 F.3d at 813.*Life After Hate, Inc. v. Free Radicals Project, Inc.*, 410 F. Supp. 3d 891, 909-910 (N.D. Ill. 2019). In fact, the courts in this district recognize that allegations of delay, if without explanation, at best provide circumstantial evidence regarding irreparability. *Santa Maria v. Loyola Univ. of Chi. Stritch Sch. of Med.*, 2025 U.S. Dist. LEXIS 7810, *24-25 (N.D. Ill.). Where, as here, there has been a showing that any purported delay was caused by plaintiffs making good faith efforts to investigate and/or resolve the allegations short of filing a lawsuit, courts in this district have found even lengthy delays may not undermine a claim of irreparable harm. *Promatek* at 910; *Peng v. Schedule A*, at *3 (Six months between infringing activity and filing suit did not preclude irreparable harm finding where, prior to filing suit, plaintiff lodged a complaint with Amazon which was disregarded).

Defendant's reliance on *Notre Dame v. Sebelius* is misguided at best. Though the court made mention of Notre Dame's delay in the opinion, the larger issue was that the court found that Notre Dame had a low likelihood of success on the merits. 988 F. Supp. 2d 912, *934 (2013). Furthermore, the court found Notre Dame's reasons for its delay in filing for a preliminary injunction "hard to swallow" because, in part, it knew of the approval and deadlines for the offensive regulations more than five months before filing its lawsuit. *Id.* at 918. As an initial matter, as outlined above, Plaintiffs have not engaged in a delay, have been working diligently to resolve the matter without resort to court action, and were only first advised of the unlawful training and attestation requirements in February 2025. At that time, Plaintiffs had no reason to believe that alternative measures would not be fruitful or that the failure to participate in the training would result in such drastic consequences. Plaintiffs were not faced with anything near the definiteness of the federal law at issue in *Notre Dame v. Sebelius*, if anything, they had every reason to believe this training would be no different than other trainings where a failure to comply would be largely without consequence. Doc. 7-3, ¶ 10.

The other cases Defendants cite are similarly distinguishable: *Ixmation, Inc. v. Switch Bulb, Co.*, 2014 U.S. Dist. LEXIS 150787 *; 2014 WL 5420273 (N.D. Ill.) (Plaintiff delayed proceedings by failing to pay arbitration fees and failed to seek other relief prior to requesting a preliminary injunction); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846 (7th Cir. 2003)Newdow v. Bush, 355 F. Supp. 2d 265 (D.D.C 2005) (Plaintiff's requested sought to disrupt the status quo); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1122 (7th Cir. 1983) (Plaintiff made bare bones pro forma request for preliminary injunction two months after a ruling on class certification ); *Ripple v. Zurich Am. Ins. Co.*, 2017 U.S. Dist. LEXIS 148223 (E.D. Wisc.) (Plaintiff only filed request for preliminary injunction in response to declaratory judgment action); *Checker Car Club of Am., Inc. v. Fay,* 262 F. Supp. 3d 621, 629-630 (N.D. Ill.) (Defendant agreed to stipulation that would cease the escalating harm Plaintiff cited to as reason for requiring a preliminary injunction).

As a final matter, it should be noted that at no time did the Plaintiffs lull the Defendants into a false sense of security that the issues they had raised about the unlawfulness of the training and attestations at issue in this case were resolved or that the Plaintiffs had somehow acquiesced to them. *Int'l Star Registry of Ill., Ltd.* at *11-12. As outlined above and herein, the Plaintiffs and others engaged in continued and concerted efforts to remind Defendants of their objections and opposition to the training and attestations, and made continued good faith efforts to reach a resolution or compromise, right up through the date of filing this lawsuit when counsel engaged in discussions regarding the same. *Data Mgmt. Ass'n Int'l v. Enter. Warehousing Sols.*, 2020 U.S. Dist. LEXIS 242699, *15-16 (Analysis of purported "delay" is only relevant to the extent Plaintiff lulled Defendant into a false sense of security). Plaintiffs have thoroughly and credibly explained their reasons for the timing of this lawsuit and the relief sought therein and in their application for preliminary relief.

### 3. Through the training, Plaintiffs and the class members they represent are suffering ongoing harm.

Northwestern argues that there is no "present, imminent, or irreparable harm" warranting an order permitting students to revoke their acknowledgments of the attestation policy, asserting that "past events … cannot form the basis for emergency injunctive relief." Br. at 11. This argument fails. The harm here is not merely historical, it is ongoing. As Professor Tilley testifies, students' exposure to classroom material is limited through the IHRA definition. Ex. 3 ¶¶ 8-9. Students who have already completed the required training and attestation are under continuing threat of discipline for challenging Zionism. By signing the attestation, students affirm their agreement to comply with Northwestern's newly broadened definition of antisemitism and to refrain from any expression or activity that the University deems "antisemitic" under that definition.

Northwestern's reliance on *Al-Alamin v. Gramley*, 926 F.2d 680 (7th Cir. 1991), is misplaced. In *Al-Alamin*, the district court issued injunctive relief even after acknowledging that the prison was not violating inmates' First Amendment rights, leading the Seventh Circuit to reverse. *Id.* at 688. Here, by contrast, Plaintiffs have demonstrated that Northwestern's mandatory attestation policy actively infringes their rights by compelling speech, discriminating based on political and associational identity, and suppressing protected expression.

Likewise, *Long v. Brown*, No. 2:14-cv-00381-JMS-WGH (S.D. Ind. July 9, 2015), is inapposite. There, the inmate sought to alter the existing restriction on communication with his fiancée- an inmate at a different facility, which the court found did not warrant extraordinary relief because "the status quo [was] the denial of communication." *Id.* at *2–3*. Here, the "status quo" is the long-established protection of students' rights to be free from discrimination, including associational discrimination, and to engage in free speech without university-imposed ideological conformity. An order allowing students to revoke attestation without penalties would preserve the status quo.

B. The impact of Northwestern's Attestation requirement on international students

15

International students must maintain a student visa for study. U.S. Citizenship & Immigr. Servs., *Policy Manual*, vol. 2, pt. F, ch. 1(A). Under DHS regulations, F1 status remains valid for the 'duration of status,' defined as the time during which an F-1 student pursues a full course of study or authorized training. 8 C.F.R. § 214.2(f)(5)(i); *Student Doe #1 v. Trump*, No. 25-C-4188, at *2 (N.D. Ill. May 8, 2025). Failure to enroll, suspension or expulsion can lead to SEVIS termination, which immediately ends lawful status and work authorization.[4]

Northwestern's new mandatory training course applies equally to international students. Northwestern advised visa holders to consult with its Office of International Student and Scholar Services (OISS) about potential immigration consequences of failing to comply. (Dkt. 7-5 at 49).

This case presents the same impending harm recognized in *Student Doe #1 v. Trump*, where the court held DHS' termination of students' SEVIS records caused irreparable harm. No. 25-C-4188, at *25–29*. By conditioning registration on compelled attestations, Northwestern forces students to choose between surrendering protected rights or facing SEVIS termination. As in *Student Doe #1*, where the court ordered reinstatement of SEVIS records to prevent status gaps, *id.* at *12–13*, Northwestern's penalty would trigger immigration consequences beyond students' control and inflict the same unlawful deprivation of status and security. *Id.* at *28–29, 31–32*

Northwestern acknowledges the imminent harm to international students, but argues the failure to litigate sooner precludes emergency relief. As argued above, (IV.A), Northwestern's claim that plaintiffs delayed unreasonably in seeking relief is unfounded because Plaintiffs acted diligently to all internal remedies before filing suit.

---

[4] U.S. Dep't of Homeland Sec., *SEVIS Help Hub: Termination Reasons* (Apr. 9, 2025), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/termination-reasons.

Respectfully submitted,

Plaintiffs Grad Workers for Palestine,
Ifeayin Eziamaka Ogbuli, and Marwa Tahboub

/s/ Rima Kapitan

/s/ M. Nieves Bolaños

/s/ Patrick Cowlin

/s/ Christina Abraham


KAPITAN GOMAA LAW, P.C.
Rima Kapitan (Atty No. 6286541)
Yusra Gomaa (Atty No. 6299883)
Hannah Moser (Atty No. 6349688)
P.O. Box 46503
Chicago, IL 60646
Phone: (312) 566-9590
rima@kapitangomaa.com

HAWKS QUINDEL S.C.
M. Nieves Bolaños (Atty No. 6299128)
Patrick Cowlin (Atty No. 6308800)
Illinois Attorney No.
111 E. Wacker Drive
Suite 2300
Chicago, IL 60601
Phone: (312) 224-2423
mnbolanos@hq-law.com

CAIR-CHICAGO
Christina Abraham (Atty No. 6298946)
17 N. State St, Ste 1500
Chicago, IL 60602
Phone: (312) 212-1520
cabraham@cair.com

Attorneys for Plaintiffs